

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-11-2004

# Lum v. Bank Amer

Precedential or Non-Precedential: Precedential

Docket No. 01-4348P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Lum v. Bank Amer" (2004). *2004 Decisions.* Paper 892.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/892

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL
UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

_____

No: 01-4348

_____

HING Q. LUM; DEBRA LUM, husband
and wife,
individually and on behalf of all persons
similarly situated; GARY ORIANI

v.

BANK OF AMERICA; CITIBANK,
N.A.; CHASE MANHATTAN BANK;
MORGAN GUARANTY TRUST CO.;
FIRST UNION NATIONAL BANK;
WELLS FARGO BANK, N.A.; FLEET
BANK; PNC BANK N.A.;
THE BANK OF NEW YORK; KEY
BANK; BANK ONE ; U.S. BANK;
JOHN DOES, ONE THROUGH 100

Hing Q. Lum, Debra Lum, and
Gary S. Oriani,

Appellants

_____

Appeal from the United States District
Court
for the District of New Jersey
(D.C. Civil Action No. 00-cv-00223)
District Judge: Honorable Faith S.
Hochberg

_____

Argued on June 2, 2003

Before: SLOVITER, ALITO and ROTH,
Circuit Judges

(Opinion filed: March 11, 2004)

Ira A. Schochet, Esquire

G. Martin Meyers, Esquire (Argued)

35 West Main Street, Suite 106

Denville, New Jersey 07834

Counsel for Appellants

William E. Deitrick, Esquire

Mayer, Brown, Rowe & Maw

190 South LaSalle Street

Chicago, Illinois 60603

Richard H. Klapper, Esquire

Sullivan & Cromwell

125 Broad Street

New York, New York 10004

Kenneth N. Laptook, Esquire

Wolff & Samson, P.C.

5 Becker Farm Road

Roseland, New Jersey 07068

Peter E. Greene, Esquire (Argued)

Skadden, Arps, Slate, Meagher & Flom, LLP

Four Times Square

New York, New York 10036

Joseph L. Buckley, Esquire

Sills, Cummis, Radin, Tischman

Epstein & Gross

One Riverfront Plaza

Newark, New Jersey 07102

Gregory R. Haworth, Esquire

Duane, Morris LLP

744 Broad Street, Suite 1200

Newark, New Jersey 07102

Anthony J. Laura, Esquire

Reed Smith, LLP

One Riverfront Plaza

Newark, New Jersey 07102

Anthony P. La Rocco, Esquire

Kirkpatrick & Lockhart, LLP

One Riverfront Plaza, 7th Floor

Newark, New Jersey 07102

Darryl J. May, Esquire

Ballard, Spahr, Andrews & Ingersoll, LLP

1735 Market Street, 51st Floor

Philadelphia, PA 19103

Frederick A. Nicoll, Esquire

Dorsey & Whitney, LLP

East 80, Route 4

Paramus, New Jersey 07652

Brian J. McMahon, Esquire

Gibbons, Del Deo, Dolan, Griffinger & Vecchione

One Riverfront Plaza

Newark, New Jersey 07101

William T. Marshall, Esquire

Zeichner, Ellman & Krause

103 Eisenhower Parkway

Roseland, NJ 07068

Allen E. Molnar, Esquire

Klett, Rooney, Lieber & Schorling

550 Broad Street, Suite 810

Newark, NJ 07102

Mark S. Melodia, Esquire

Reed Smith

136 Main Street

Princeton Forrestal Village, Suite 250

Princeton, NJ 08540


Counsel for Appellees

---

OPINION

---

ROTH, Circuit Judge:

The meaning of the term "prime rate" lies at the heart of this appeal. Plaintiffs, Hing Q. Lum, his wife Debra, and Gary Oriani have borrowed money from defendant banks pursuant to lending agreements with "prime plus" interest rates. Plaintiffs claim in their Amended Complaint that the defendant banks, in setting "prime plus" interest rates, have violated the Sherman Antitrust Act, 15 U.S.C. § 1, and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), § 1962(d). The banks allegedly violated the Sherman Act by agreeing to misrepresent that "prime rate" is the lowest rate available to their most creditworthy borrowers, when in fact they have offered some large borrowers financing at interest rates below prime rate; they allegedly gave false information about their "prime rate" both to consumers who were seeking credit and to leading financial publications, such as the *New York Times* and the *Wall Street Journal*,

which publish independent indices of the prime rate. The banks allegedly violated RICO by making these misrepresentations about "prime rate" through the mails and over interstate wires. Plaintiffs claim that the fraudulently inflated "prime rate" has resulted in their being charged higher interest than permitted by the terms of the "prime plus" loan agreements.

The District Court dismissed plaintiffs' RICO claim because it lacked the specificity in pleading fraud that is required under Fed. R. Civ. P. 9(b). It dismissed the antitrust claim for failure to meet the minimum standards for pleading an antitrust conspiracy. Lum v. Bank of America, No. 00-223, slip op. at 11-12, (E.D. Pa. Nov. 29, 2001).[1]

We agree that the RICO claim was properly dismissed. Because it is predicated on mail and wire fraud, Federal Rule of Civil Procedure 9(b) requires that the fraud be pled with specificity. It was not. Moreover, the antitrust claim is also based on fraud – on misrepresentations in the information given to consumers and on misrepresentations in the information

---

Plaintiffs also allege violations of the New Jersey Consumer Fraud statute, 56:8-2 et seq., and the New Jersey common law of contracts. Having dismissed all the federal claims, the District Court dismissed these claims for lack of supplemental jurisdiction. See 28 U.S.C. §1367(c)(3); Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995).

given to the independent financial publications. Although antitrust claims generally are not subject to the heightened pleading requirement of Rule 9(b), fraud must be pled with particularity in <u>all</u> claims based on fraud – "In <u>all</u> averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b) (emphasis added). Fraud is the basis for the antitrust violation alleged here. In paragraph 18 of the Amended Complaint, plaintiffs aver that the banks "<u>fraudulently</u> and artificially inflate[d] the 'prime rate' published in the outside indexes by <u>falsely</u> reporting the Bank's individual prime rates to the various publications. . . . the 'prime rate' published by the outside indexes remained artificially high and the prime plus interest rates on the consumer credit instruments were <u>fraudulently</u> inflated." (emphasis added). Because, as in the RICO claim, plaintiffs' allegations of fraud did not comply with Rule 9(b), the antitrust claim would properly have been dismissed on these grounds.[2]

Finally, we agree with the District Court's denial of leave to amend. Plaintiffs' statements at oral argument and their briefs both before the District Court and before us make it clear that granting leave to amend would be futile. We will,

therefore, affirm the judgment of the District Court.

## I. Facts and Procedural History

On January 14, 2000, Hing and Debra Lum filed a complaint in the United States District Court for the District of New Jersey on behalf of themselves and of a purported class of similarly situated individuals who borrowed money from the defendant banks from April 22, 1987, to the present. The purported class was not certified prior to dismissal of the complaint. The defendants in the suit are twelve of the country's largest banks and one hundred unnamed individuals. On April 6, 2000, the plaintiffs filed an Amended Complaint adding Gary Oriani as a plaintiff. The Amended Complaint alleges that defendants violated RICO, the Sherman Antitrust Act, and New Jersey law by the manner in which they fixed the "prime plus" interest rate. Prime plus interest rates are tied to the "prime rate" as it is defined by the lender or by an outside index reported in a major financial publication. These publications in turn develop their indices from the prime rates reported by leading financial institutions, including defendant banks. At the heart of the Amended Complaint are the following allegations:

> 17. At some point in time prior to the Class Period, the

---

[2] Although the allegations of conspiracy in the Amended Complaint are somewhat conclusory, we do not agree with the District Court's position that they do not meet the pleading requirements of Fed. R. Civ. P. 8(a).

4

Bank Defendants formulated and carried out a plan, scheme and conspiracy to fix and control the "prime rate" published by the outside indexes. Because these prime rate indexes had been incorporated into thousands of existing financial instruments as well as into new financial instruments written by the Banks, control of the prime rate published in the outside indexes would enable the Banks to effectively raise interest rates unilaterally on these credit instruments, and in so doing increase their income and profits by millions, if not billions of dollars on an annual basis.

18. During the Class Period, while maintaining an appearance of following a prime rate set by neutral forces, the Banks entered into a plan, scheme, conspiracy and course of conduct designed to <u>fraudulently</u> and artificially inflate the "prime rate" published in the outside indexes by <u>falsely</u> reporting the Bank's individual prime rates to the various publications. To effectuate this scheme, the Banks reported as their prime rates, rates far in excess of the rates the Banks actually charged to their largest and most creditworthy customers. As a result of this plan, scheme, conspiracy and course of conduct, the "prime rate" published by the outside indexes remained artificially high and the prime plus interest rates on the consumer credit instruments were <u>fraudulently</u> inflated.

(emphasis added).

The Amended Complaint then identifies three financial transactions pursuant to which the named plaintiffs obtained financing at a "prime plus"

5

interest rate. The plaintiffs did not attach the agreements documenting these three transactions, but the defendants provided copies of the agreements in support of their motion to dismiss.[3] First, Hing and Debra Lum obtained a home equity loan from Morris County Savings Bank, now First Union National Bank, in April 1987. This loan required the plaintiffs to pay interest at a rate of two percentage points above the prime rate, as reported in *The New York Times*. Second, plaintiff Debra Lum received credit cards from defendant Bank of America in 1990 and from Chase Manhattan Bank in 1991. These cards have interest rates tied to the prime rate reported in the *Wall Street Journal*. The

---

[3] While plaintiffs did not attach this credit agreement to the complaint, they do not dispute that the District Court properly considered the agreement. In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). A document forms the basis of a claim if the document is "integral to or explicitly relied upon in the complaint." Burlington Coat Factory, 114 F.3d at 1426 (emphasis omitted). The purpose of this rule is to avoid the situation where a plaintiff with a legally deficient claim that is based on a particular document can avoid dismissal of that claim by failing to attach the relied upon document. See Pension Benefit Guar. Corp., 998 F.2d at 1196. Further, considering such a document is not unfair to a plaintiff because, by relying on the document, the plaintiff is on notice that the document will be considered. See Burlington Coat Factory, 114 F.3d at 1426. In the present case, there is no dispute that the credit agreements are integral to and relied upon in the complaint.

It should be noted that, under this standard, the District Court improperly took judicial notice of Hing Lum's deposition testimony in a prior proceeding that he understands that the term prime rate does not mean the lowest rate available to a bank's most creditworthy customers. While a prior judicial opinion constitutes a public record of which a court may take judicial notice, it may do so on a motion to dismiss only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion. See Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd., 181 F.3d 410, 427 (3d Cir. 1999). Thus, "a court that examines a transcript of a prior proceeding to find facts converts a motion to dismiss into a motion for summary judgment." Id. at 427 n. 7. Nevertheless, since there are sufficient other grounds to support dismissal here, this error is not a basis for reversal.

Bank of America agreement defines this prime rate as "the base rate on corporate loans at large U.S. money center commercial banks." The Chase Manhattan agreement states that:

> For purposes of this Agreement, the Prime Rate as published in "Money Rates" table of *The Wall Street Journal* or any other newspaper of national circulation selected by us is merely a pricing index. It is not, and should not be considered by you to represent, the lowest or the best interest rate available to a borrower at any particular bank at any given time.

In connection with all three of these transactions, the defendant banks have sent to plaintiffs, through the U.S. mail, monthly statements regarding the prime rate.

On May 5, 2000, defendants moved to dismiss the complaint. In their opposition to the motion, plaintiffs submitted a detailed RICO Case Statement pursuant to the Local Rules of the District of New Jersey. On November 29, 2001, following oral argument, the District Court granted defendants' motion to dismiss. Plaintiffs filed a timely appeal.

**II. Jurisdiction and Standard of Review**

The District Court had jurisdiction over the federal RICO and antitrust claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. We have jurisdiction over the District Court's final order pursuant to 28 U.S.C. § 1291.

We exercise plenary review over a district court's dismissal of a complaint under Rule 12(b)(6). Ditri v. Coldwell Banker Residential Affiliates, Inc., 954 F.2d 869, 871 (3d Cir. 1992). We review a district court's denial of leave to amend for abuse of discretion. Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc., 663 F.2d 419, 425 (3d Cir. 1981).

**III. Discussion**

In considering a motion to dismiss, a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiffs. Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993). A court may dismiss the complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). In the present case, even accepting the allegations in the complaint as true and drawing every reasonable inference in favor of the plaintiffs, they have failed to adequately plead either a RICO or an antitrust cause of action.

A. RICO:

The plaintiffs have failed to adequately plead a RICO cause of action predicated on mail and wire fraud because their general allegations of fraud do not comply with Rule 9(b) and their specific allegations regarding particular transactions do not amount to fraud. The RICO statute provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). It is also unlawful for anyone to conspire to violate § 1962(c). See 18 U.S.C. § 1962(d). In order to plead a violation of RICO, plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. See Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985). A pattern of racketeering activity requires at least two predicate acts of racketeering. See 18 U.S.C. § 1961(5). These predicate acts of racketeering may include, inter alia, federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343. See 18 U.S.C. § 1961(1); Saporito v. Combustion Eng'g, Inc., 843 F.2d 666,

676 (3d Cir. 1988), vacated on other grounds, 489 U.S. 1049 (1989).

The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud. See 18 U.S.C. §§ 1341, 1343. "'A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension.'" Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 528 (3d Cir. 1998) (quoting Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir. 1991)).

Where, as here, plaintiffs rely on mail and wire fraud as a basis for a RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity. See Saporito, 843 F.2d at 673. In order to satisfy Rule 9(b), plaintiffs must plead with particularity "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). Plaintiffs may satisfy this requirement by pleading the "date, place or time" of the fraud, or through "alternative means of injecting precision and some measure of substantiation into their allegations of

8

fraud." Id. (holding that a plaintiff satisfied Rule 9(b) by pleading which machines were the subject of alleged fraudulent transactions and the nature and subject of the alleged misrepresentations). Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation. See Saporito, 843 F.2d at 675; Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 658-59 (3d Cir. 1998); Klein v. General Nutrition Co., Inc., 186 F.3d 338, 345 (3d Cir. 1999).

In the present case, the RICO cause of action consists of the following allegation of mail and wire fraud:

44.     During the Class Period, within the meaning of 18 U.S.C. §1962(c), the Defendants conducted and participated, directly and indirectly, in the conduct of the enterprises through the pattern of racketeering activity:

(a)     During the Class Period, Defendants used the U.S. mails and/or interstate wire facilities in connection with accomplishing the fraudulent scheme described in this Complaint. Each such use of the U.S. mails or interstate wire facilities was for the purpose of executing and furthering the fraudulent scheme or conspiracy described in this Complaint. Each month during the Class Period, Defendants mailed thousands of bank statements, advertisements for credit cards, contracts and promotional materials containing the fraudulent stated and artificially inflated interest rates to Plaintiffs and the Class in furtherance of their fraudulent scheme. Each such act constituted a violation of 18 U.S.C. § 1341.

(b)     During the Class Period Defendants transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures or sounds for the purpose of executing a scheme or artifice to defraud the plaintiffs, or for obtaining money or property of the Plaintiffs and the Class by means of false or fraudulent pretenses, representations or promises as set forth in this Complaint in the allegations set forth above. Examples include interstate telephone calls and/or facsimile

9

transmissions by prospective borrowers, seeking to promote borrowing allegedly tied to the "prime rate," or to collect interest charges and loan payments allegedly due in connection with borrowing on the financial and credit instruments tied to the "prime rate," as well as interstate telephone or wire transmissions of the Bank's prime rate to the publishers of the outside indexes. Each of these acts constitutes a violation of 18 U.S.C. § 1343.

The "fraudulent scheme described in the Complaint" refers to paragraphs 17 and 18 of the Amended Complaint which we have set out above in Part I.

The District Court properly ruled that these conclusory allegations do not satisfy Rule 9(b). They do not indicate the date, time, or place of any misrepresentation; nor do they provide an alternative means of injecting precision and some measure of substantiation into the fraud allegations because they do not identify particular fraudulent financial transactions. See Seville, 742 F.2d at 791. Nor do these allegations indicate which defendant(s) made misrepresentations to which plaintiff(s). See id.; Saporito, 843 F.2d at 675; Rolo, 155 F.3d at 658-59; Klein, 186 F.3d at 345.

Plaintiffs contend, however, that the District Court failed to address explicitly the fact that the factual background section of the Amended Complaint and the RICO Case Statement identify three specific allegedly fraudulent transactions – the mortgage with First Union, and the credit card transactions with Bank of America and Chase Manhattan, the dates of these transactions, and the names of the defendants who made alleged misrepresentations to particular plaintiffs.[4]

In their brief, plaintiffs claim that the RICO Case Statement alleges that Oriani entered into an instant credit agreement with Bank of New York in March 1994. However, the RICO Case Statement only alleges that Bank of New York represented a certain interest rate tied to the prime rate on a particular date. It does not allege that Oriani entered into a credit agreement with Bank of New York, the date of the credit agreement, or the terms of the agreement (in particular what interest rate Oriani would pay). Plaintiffs did not submit the credit agreement that Oriani allegedly entered into with Bank of New York. Based on the representations of Oriani's counsel at oral argument before the District Court, Bank of New York conducted a search of its records but could not find a record of the agreement with Oriani. Nevertheless, Bank of New York submitted its standard Instant Credit Agreement from the period during which Oriani claimed he entered into an agreement with Bank of New York. This agreement merely defined the term "prime rate" as the rate reported

10

Plaintiffs, citing <u>Michaels Building Co. v. Ameritrust Co.</u>, 848 F.2d 674 (6th Cir. 1988), and <u>Haroco, Inc. v. American Nat'l Bank and Trust Co. of Chicago</u>, 747 F.2d 384 (7th Cir. 1984), <u>aff'd</u> 473 U.S. 606 (1985), argue that these allegations are sufficient to plead a RICO cause of action. In <u>Michaels</u> and <u>Haroco</u>, the Courts of Appeals for the Sixth and Seventh Circuits, respectively, held that complaints adequately pled RICO causes of action predicated on mail and wire fraud when they alleged that banks misrepresented in particular loan agreements that the prime rate is the interest rate charged by the banks to their most creditworthy commercial borrowers, although in fact the banks charged lower rates to some commercial borrowers. <u>See</u> <u>Michaels</u>, 848 F.2d at 677; <u>Haroco</u>, 747 F.2d at 385.

In the present case, however, the Amended Complaint fails to allege fraud in relation to the three identified transactions because, unlike <u>Michaels</u> or <u>Haroco</u>, the plaintiffs do not, and cannot, allege that any of the three purportedly fraudulent credit agreements define the term "prime rate" as the lowest interest rate available to a bank's most creditworthy borrowers. <u>See</u> <u>id.</u>

In addition, plaintiffs make general claims that defendants misrepresented that the prime rate is the lowest rate charged to their most creditworthy customers. However, these allegations do not satisfy Rule 9(b) because they do not indicate the date, time, or place of the alleged misrepresentations, the financial transactions in connection with which these misrepresentations were made, or who made the misrepresentation to whom. <u>See</u> <u>Seville</u>, 742 F.2d at 791; <u>Saporito</u>, 843 F.2d at 675; <u>Rolo</u>, 155 F.3d at 658-59; <u>Klein</u>, 186 F.3d at 345. Plaintiffs also allege that, on February 4, 2000, and March 29, 2000, Citibank and First Union represented to the "class" that the prime rate was the rate charged to their most creditworthy commercial customers. However, plaintiffs do not allege that these representations were made to a named plaintiff, or that any particular individual entered into a financial transaction with this term. <u>See</u> <u>Rolo</u>, 155 F.3d at 659 (holding that, until a class is certified, a RICO action is one between the named plaintiffs and defendants, and the adequacy of the pleading must be analyzed with regard to the specificity of the fraud allegations relating to the named plaintiffs).

In order to counter their failure to cite specific instances of active misrepresentation that the prime rate is the lowest rate available to a bank's most creditworthy borrowers, the plaintiffs focus on omissions by defendants. They argue that the term "prime rate" is so generally understood to mean the lowest rate available to a bank's most creditworthy borrowers that the failure to disclose that some borrowers obtain loans with interest rates below the prime rate constitutes fraud.

We conclude to the contrary. Even

in the *Wall Street Journal.*

11

drawing every reasonable inference in favor of plaintiffs, the meaning of the term "prime rate" is sufficiently indefinite that it is reasonable for the parties to have different understandings of its meaning. For example, more than twenty years ago, a congressional committee, in a staff report, described "prime rate" as a "murky, ill-defined term that rarely reflects the lowest rates available to corporate customers." See Staff of House Comm. on Banking, Finance and Urban Affairs, 97th Cong., 1st Sess., An Analysis of Prime Rate Lending Practices of the Ten Largest United States Banks 3 (Comm. Print 1981). This lack of precision in the term "prime rate" has also been recognized by the courts. See, e.g., Blount Fin. Serv. Inc. v. Walter E. Heller and Co., 819 F.2d 151, 152-53 (6th Cir. 1987) ("The fact that the parties take different positions under the contract as to the appropriate prime rate, or the fact that the defendant charged too high a 'prime rate' and thereby concealed or refused to disclose what the plaintiff considers the true prime rate called for under the contract, does not give rise to a valid claim for fraud."); Wilcox v. First Interstate Bank of Oregon, 815 F.2d 522, 527-28 (9th Cir. 1987) (opining that prime rate indicates the average cost of a loan because most loans are negotiated at interest rates above or below prime); Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York, 859 F. Supp. 97, 103 (S.D.N.Y. 1994), aff'd, 99 F.3d 401 (2d Cir. 1995) (holding that a lender does not commit the predicate act of mail fraud by omitting a definition of prime rate and charging some borrowers below the prime

rate because "a decision to charge certain customers lower rates than others – a common occurrence in the banking industry – merely reflects the bank's greater confidence in the financial stability of those customers."). It is therefore unreasonable to infer that defendants' use of the equivocal term "prime rate" was reasonably calculated to deceive persons of ordinary prudence and comprehension into believing that no borrower obtained an interest rate below the prime rate. Plaintiffs' claim boils down to a disagreement about the meaning of the term "prime rate." This disagreement does not rise to the level of fraud; at most, it alleges a contract dispute. See Blount, 819 F.2d at 152-53.

Moreover, the requirement of Rule 12(b)(6) that we draw every reasonable inference in favor of plaintiffs does not preclude us from reaching this result. Plaintiffs do not ask us just to infer that the term "prime rate" means the lowest rate available to defendants' most creditworthy borrowers. They ask us to conclude that this meaning is so universally accepted that it is the only possible meaning and that a reasonable person could not understand the term to mean anything else. In light of Wilcox and Blount, this is not a reasonable inference. See Blount, 819 F.2d at 151; Wilcox, 815 F.2d at 528. We conclude that the term "prime rate," in the context in which it was used here, is imprecise.

Furthermore, even if we were to have held it to be fraudulent to use the term "prime rate" without disclosing that

some borrowers obtain financing below the prime rate, the defendants in this case clearly did disclose that some borrowers obtained financing below the prime rate. The 1991 credit card agreement between defendant Chase Manhattan and plaintiff Debra Lum states:

> For purposes of this Agreement, the Prime Rate as published in "Money Rates" table of *The Wall Street Journal* or any other newspaper of national circulation selected by us is merely a pricing index. <u>It is not, and should not be considered by you to represent, the lowest or the best interest rate available to a borrower at any particular bank at any given time.</u>

(emphasis added). Plaintiffs argue that the term "it" in the last sentence of the Chase Manhattan agreement refers to the term "index" in the preceding sentence, not the term "prime rate." This distinction is meaningless, however, because, according to the terms of the contract, the prime rate for purposes of the credit card agreement is the prime rate reported in the *Wall Street Journal*. Thus, the caveat applies equally to both rates.

Given the fact that one member of the RICO association-in-fact (alleged by plaintiffs to be the defendant banks plus the Reuters News Service, Dow Jones, Inc., *The New York Times*, and the *Wall Street Journal*) expressly stated in one of the three allegedly fraudulent credit agreements, relied upon by the plaintiffs, that the prime rate is not the lowest rate offered to the bank's most creditworthy customer, it would be difficult to conclude, as plaintiffs allege, that the defendants conducted an enterprise through a pattern of racketeering activity by making misrepresentations or omissions that were reasonably calculated to deceive persons of ordinary prudence and comprehension.

Plaintiffs, however, point to a representation in another of the three agreements, the credit card agreement between Debra Lum and Bank of America, in support of their fraud claim. They argue that the representation in this agreement – that the prime rate is "the base rate on corporate loans at large U.S. money center commercial banks" – is tantamount to defining the prime rate as the lowest rate available to a bank's most creditworthy borrowers. However, as with the term "prime rate," a person of ordinary prudence and comprehension would not conclude from this statement that no commercial borrowers obtain an interest rate below the base rate because nothing in the term "base rate" excludes the possibility of discounts for some customers. Indeed, as plaintiffs acknowledge in their opening brief, citing BLACK'S LAW DICTIONARY 1191 (6TH Ed. 1990), "base rate" is "effectively equivalent" to "prime rate." <u>See also</u> Form FR 2028a/s, Fed. Res. Board, Prime Rate Supp. to Survey of Terms of Business Lending. As with the term "prime rate,"

13

because of the possibility of discounts, the term "base rate" may not mean the lowest possible rate.

We conclude, therefore, that plaintiffs have failed to plead fraud with particularity in their RICO claim so that the District Court properly dismissed it. [5]

## B. Sherman Antitrust Act:

Similarly, since the Amended Complaint alleges that defendants carried out their antitrust conspiracy through fraud, plaintiffs have failed to state a cause of action under Section 1 of the Sherman Antitrust Act because of the defects in the fraud allegations discussed above. Generally, the pleading standard for Section 1 claims is the short and concise statement standard of Rule 8(a). In Poller v. Columbia Broad. Sys., the Supreme Court cautioned that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." 368

U.S. 464, 473 (1962); see also Hospital Bldg. Co. v. Trustees, 425 U.S. 738, 746 (1976) ("[I]n antitrust cases, . . . dismissal prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."). Likewise, in Knuth v. Erie-Crawford Dairy Coop, this Court stated that "we should be extremely liberal in construing antitrust complaints." 395 F.2d 420, 423 (3d Cir. 1968).

We have, however, recognized that "'while antitrust complaints are not subject to especially stringent pleadings, see Knuth, supra, neither are they exempt from the federal rules.'" Commonwealth of Pennsylvania v. Pepsico, Inc., 836 F.2d 173, 179 (3d Cir. 1988) (quoting Sims v. Mack Truck Corp., 488 F. Supp. 592, 608 (E.D. Pa. 1980)).

Because plaintiffs allege that the defendants accomplished the goal of their conspiracy through fraud, the Amended Complaint is subject to Rule 9(b). See Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." (emphasis added)). Plaintiffs, nevertheless, pointing to paragraph 17 of the Amended Complaint, argue that their antitrust claim merely alleges that defendants conspired to set an artificially high floor on interest rates by agreeing to raise the prime rate, and that allegations of misrepresentations regarding the prime rate only go to their RICO claim. In paragraph 17, the Amended Complaint alleges that defendants "formulated and carried out a plan, scheme and conspiracy to fix and

---

Having correctly found that plaintiffs failed to adequately plead a substantive RICO claim under 18 U.S.C. § 1962(c), the District Court properly dismissed the RICO conspiracy claim under 18 U.S.C. § 1962(d). "Any claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." Lightning Lube, Inc. v. WITCO Corp., 4 F.3d 1153, 1192 (3d Cir. 1993).

14

control the 'prime rate' published by the outside indexes."

This paragraph of the Amended Complaint cannot, however, be read in isolation. See Chabal v. Reagan, 822 F.2d 349, 357 (3d Cir. 1987). The very next paragraph of the Amended Complaint makes clear that plaintiffs are alleging that the defendants carried out this plan, scheme, and conspiracy through fraud:

> 18. During the Class Period, while maintaining an appearance of following a prime rate set by neutral forces, the Banks entered into a plan, scheme, conspiracy, and course of conduct designed to fraudulently and artificially inflate the "prime rate" published in the outside indexes by falsely reporting the Bank's individual prime rates to the various publications. To effectuate this scheme, the Banks reported as their prime rates, rates far in excess of the rates the Banks actually charged to their largest and most creditworthy customers. As a result of this plan, scheme, conspiracy and course of conduct, the "prime rate" published by the outside indexes remained artificially high and the prime plus interest rates on the

> consumer credit instruments were fraudulently inflated.

(emphasis added). In short, the fact that the fraud is not identified in paragraph 17 of the Amended Complaint does not rule out that fraud is part of the antitrust allegation because paragraph 17 merely identifies the existence of a conspiracy to fix the prime rate, while paragraph 18 identifies how the rate fixing was accomplished – through fraud.

Because plaintiffs have alleged fraud as a basis for their antitrust cause of action, this claim is subject to the heightened pleading requirement of Rule 9(b). As discussed above, plaintiffs have failed to satisfy the requirements of Rule 9(b) with regard to their theory that defendants misrepresented that the prime rate would be the lowest rate available to their most creditworthy customers. They have also failed to particularize how false information on their "prime rate" was sent to the financial publications for inclusion in the independent indices. They have not set out who sent what information to whom or when it was sent. Nor have they particularized by how many points the prime rate was falsely reported or whether there was any consistency among the defendant banks in the amount by which the prime rate was falsely reported. We conclude, therefore, that plaintiffs have not adequately pled an antitrust claim predicated on fraud.

C. Leave To Amend:

15

Can plaintiffs cure the deficiencies in the Amended Complaint by further amendment, either by providing particulars of the fraudulent conduct or by dropping the allegations of fraud? The Federal Rules of Civil Procedure provide that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The District Court denied the request to amend on the basis that amendment would be futile.

We agree that it is clear from the statements in plaintiffs' briefs and at oral argument both before the District Court and before us that leave to amend would be futile. Plaintiffs cannot allege sufficient facts to support fraud in either the RICO or the antitrust claims. At oral argument, plaintiffs did not identify any additional allegations of fraud related to other financial transactions, or of other misrepresentations made in connection with the three identified transactions, that they would include in a Second Amended Complaint. Having examined the contracts from the three purportedly fraudulent transactions, it is clear that there are no further particulars of fraud in these transactions to set out and that granting leave to amend would be futile.

Similarly, permitting plaintiffs to amend their antitrust claim to remove the fraud allegation would be futile. They will have no additional information to provide here either. The only alternative basis for the antitrust claim that plaintiffs propose is a claim of conscious parallelism. As plaintiffs' attorney stated at oral argument:

what we believe at this time is the basis of the claim, that we can assert in good faith is based on conscious parallelism, and it might very well be that during discovery, we will be able to establish that there were actual meetings and direct discussions.

This statement, viewed in light of the record before the court, is not sufficient to establish conscious parallelism. "The law is settled that proof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or express, can be inferred but that such evidence, without more, is insufficient unless the circumstances under which it occurred make the inference of rational independent choice less attractive than that of concerted action." Bogosian, 561 F.2d at 446. We have identified two such circumstances, known as "plus factors": 1) where defendants acted in contradiction of their own economic interests, and 2) where there is satisfactory demonstration of a motive to enter into an agreement. See id.; Venzie Corp. v. United States Mineral Prod., 521 F.2d 1309, 1316 (3d Cir. 1975). Since conscious parallelism is an evidentiary rule that relates to how a plaintiff may prove the existence of an agreement, a plaintiff need not allege the existence of these plus factors in order to plead an antitrust cause of action. See Bogosian, 561 F.2d at 446 (holding that plaintiffs adequately pled an

16

antitrust cause of action where they alleged a combination and that the defendants entered into parallel contracts with tying agreements).

In the present case, however, granting plaintiffs leave to plead conscious parallelism would be futile because plaintiffs do not allege, or seek to amend their complaint to allege, that defendants engaged in consciously parallel pricing as to the final interest rate that defendants charged consumers. Indeed, the Amended Complaint alleges that the Chase Manhattan Advantage Credit agreement offered an interest rate of 6 percentage points above the prime rate (or 5 percentage points above the prime rate if the customer had a Chase Manhattan banking relationship), but Citibank offered an interest rate of 1.65 percentage points above the prime rate. In addition, in their RICO Case Statement, plaintiffs allege that the following banks offered the following interest rates on the following credit cards through March 29, 2000:

Percentage Points Above Prime

Bank of America:

Visa Classic 2.9

Visa Gold 2.9

Standard Mastercard2.9

Bank One

Visa OneCard Platinum (for purchase)6.9

CitiBank

Citi Platinum Select 1.65

Citi Advantage Card 9.9

First Union

Visa Classic 7.9

Visa Gold 6.4

Visa Platinum 4.9

US Bank

WorldPerks Visa Card 9.75

Wells Fargo

Proven Credit Standard/Platinum MasterCard 9.4

Preferred Proven Credit Standard/Platinum MasterCard 7.4

Premium Credit Standard/Platinum MasterCard 4.0

Standard Mastercard 7.4

Further, according to the RICO Case Statement, some defendants offered prime plus interest rates where the percentage points above the prime rate varied. The following banks offered the following interest rates on the following credit cards through March 29, 2000:

Percentage Points Above Prime

Bank of America

Visa Classic 2.9 to 12.9

Standard Mastercard 2.9 to 12.9

Visa Gold 2.9 to 12.9

Visa Platinum 7.9 to 12.9

Key Bank

17

Variable Rate Gold Visa1.99 to 13.99

Variable Rate Gold MasterCard 1.99 to 13.99

Variable Rate Classic Visa 1.99 to 13.99

Variable Rate Classic MasterCard 1.99 to 13.99

US Bank

Visa Classic 2.9 to 8.9

Visa Platinum 1.9 to 8.9

Still other defendants offered incentives. For example, Bank One offered a credit card with an introductory rate of 2.9% for the first six months, followed by a rate of 6.9 percentage points above the prime rate (for purchases). Chase Manhattan offered a credit card with a fixed rate of 3.99% for the first nine months, followed by a rate of 8.49 percentage points above the prime rate (9.49 percentage points for non-preferred customers). Bank of New York offered a credit card with an introductory rate of 5.99% for nine months, followed by a fixed rate of 13.49% for balances greater than or equal to $2,500, or 15.49% for balances less than $2,500 – or a customer could elect a variable rate after the first month of 5.49 percentage points above the prime rate for balances greater than or equal to $2,500, or 7.49 percentage points above the prime rate for balances less than $2,500.

Similarly, the RICO Case Statement alleges that the following banks offered the following interest rates on lines of credit:`

Percentage Points Above Prime

Chase Manhattan Advantage Credit 6

First Union Cash Reserve Credit (New York) 9.5

Key Bank Preferred Line of Credit (New York)5.49

PNC Unsecured Line of Credit A competitive rate

Bank of New York EquityLink Line of Credit0[6]

The only reasonable conclusion that can be drawn from these figures is that there was price competition as to the final interest rate on credit cards and lines of credit. See Hishon, 467 U.S. at 73.

Plaintiffs argue that they do not have to allege conscious price parallelism as to the actual interest rate charged to customers because their allegations of conscious price parallelism as to the prime rates is sufficient to state an antitrust cause of action. In support of this argument, plaintiffs cite several cases that recognize that an agreement to artificially inflate the base rate from which negotiations begin can violate the antitrust laws by causing consumers to pay more than they would absent an agreement to inflate the base rate. See In re NADSAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 517-18

---

The Bank of New York EquityLink Line of Credit had an introductory fixed rate of 5.9% for the first six months.

(S.D.N.Y. 1996); In re Indus. Diamond Litig., 167 F.R.D. 374, 383 (S.D.N.Y. 1996); Fisher Brothers, 102 F.R.D. 570, 578 (E.D. Pa 1984); In re Glassine and Greaseproof Paper Antitrust Litig., 88 F.R.D. 302, 306 (E.D. Pa. 1980). We need not decide whether an actual agreement to artificially raise a base price violates antitrust laws because that issue is not before us. Rather, the issue before us is whether we reasonably can infer from plaintiffs' factual allegations of parallel base pricing that defendants agreed to inflate the interest rates charged to consumers and small businesses.

The Supreme Court and this Court already have decided this issue in the negative. See Brooke Group LTD v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227, 235-36 (1993); In re Baby Food Antitrust Litig., 166 F.3d 112, 128 (3d Cir. 1999). In Brooke Group and In re Baby Food Antitrust Litigation, the plaintiffs argued that an inference of an agreement to artificially inflate prices could be drawn from evidence of consciously parallel list prices. See id. Both the Supreme Court and this Court rejected this argument, holding that the relevant inquiry for purposes of determining if an agreement to inflate prices can be inferred from consciously parallel pricing is whether there is consciously parallel pricing in the final price consumers pay, not whether there is conscious parallelism in the list price from which negotiations for the final price begins. See id. As we stated in In re Baby Food Litigation:

> In an industry with hundreds of products and a pervasive policy of allowing discounts and promotional allowances to purchasers, . . . charts and reports focusing on list prices rather than transactional prices have little value. "Especially in an oligopoly setting, in which price competition is most likely to take place through less observable and less regular means than list prices, it would be unreasonable to draw conclusions about the existence of tacit coordination or supracompetitive pricing from data that reflect only list prices." Brooke Group, 509 U.S. at 236.

166 F.3d at 128 (emphasis in original).

While Brooke Group involved judgment as a matter of law and In re Baby Food Antitrust Litigation involved summary judgment, assuming the factual allegations are true in the present case and drawing every reasonable inference in favor of plaintiffs, the plaintiffs contend that they can allege that there is price parallelism in setting the prime rate. We can see, however, from the information provided to the District Court by the plaintiffs that, due to discounts and competition regarding how many percentage points above the prime rate that banks may charge, there is not price

19

parallelism in the final interest rate charged to consumers. Under these circumstances, in light of Brooke Group and In re Baby Food Antitrust Litigation, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Therefore, granting leave to amend would be futile.

## IV. Conclusion

For the reasons stated above, we will affirm the judgment of the District Court.