**In re TARGET INDUSTRIES, INC. and Lance Plastics, Inc., Debtors.**

**Thomas F. Fox, Target Holdings, Inc., Target Industries, Inc. and Robert B. Wasserman, Plaintiffs,**

**v.**

**Congress Financial Corporation, Martin Goz, Sr., ABC Companies 1–20, John Does 1–20 and Jane Does 1–20, Defendants.**

**Bankruptcy Nos. 99–43997(RG), 99–43998(RG).**
**Adversary No. 02–3267(RG).**

United States Bankruptcy Court, D. New Jersey.

July 11, 2005.

Andrew J. Kyreakakis, P.C., by Andrew J. Kyreakakis, Bloomfield, NJ, for Plaintiffs Thomas F. Fox, Target Holdings, Inc., Target Industries, Inc. and Robert B. Wasserman.

Duane Morris LLP, by William S. Katchen, Joseph H. Lemkin, Newark, NJ, for Defendant Congress Financial Corporation.

Otterbourg, Steindler, Houston & Rosen, PC, by Stanley L. Lane, Jr., New York City, for Defendant Congress Financial Corporation.

McNally & Busche LLC, by Stephen B. McNally, Newton, NJ, for Defendants Martin Goz, Sr., Arlene Goz and Target Industrial Packaging.

### OPINION

ROSEMARY GAMBARDELLA, Chief Judge.

#### MATTER BEFORE THE COURT

Before the Court is a Motion to Dismiss the instant Adversary Complaint filed on behalf Congress Financial Corporation ("Defendant" or "Congress"). The motion is filed in response to the Complaint filed on behalf of Thomas F. Fox ("Fox") and Robert B. Wasserman, Chapter 11 Trustee for Target Industries, Inc. and Lance Plastics, Inc. (collectively the "Plaintiffs") against Congress, the Debtors' former principal, and numerous other defendants (the "Complaint"). The Plaintiffs have filed opposition to the Motion to Dismiss as well as a cross-motion to compel compliance with this Court's April 12, 2001 Order and for fees. In addition to the Motion to Dismiss, the Congress brings a Motion in Limine to Suppress the Transcript and Tape of Telephone Conversations between Jean Milman and Principals of Target Industries, Inc (the "Milman Tapes"). The Plaintiffs oppose the Defendant's motion to suppress. A hearing on the motions was conducted on January 30, 2003.

The following constitutes this Court's findings of fact and conclusions of law.

#### FACTS AND PROCEDURAL HISTORY [1]

Target Industries, Inc. and Lance Plastics, Inc. (the "Debtors") are New Jersey corporations engaged at the time of the bankruptcy filing in the manufacture and sale of customized plastic bags. (See, *Plaintiffs' Complaint,* at 4). Acting in concert, Lance Plastics, Inc. ("Lance") manufactured plastic bags which Target Industries ("Target") then sold and distributed. On December 30, 1999, Target and Lance each filed separate voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"). On February 2, 2001, this Court entered an order substantively consolidating the bankruptcy estates of Tar-

---

**1.** As this is a Motion to Dismiss rather than a Motion for Summary Judgment, this statement of facts is provided as a means of understanding the instant dispute. It should not be taken as a final determination of facts by this Court.

get and Lance Plastics. Mr. Wasserman was appointed Chapter 11 Trustee.

## A. The Pre–Petition History

Although not clear from the record how long Target and Lance had been in operation, the corporations existed as early as 1979. On or about September 21, 1979, Congress began providing asset based lending services to Target and Lance. Throughout the relationship, Congress' loans, advances and other forms of credit were secured by the assets of Target and Lance. When the Debtors ultimately filed for bankruptcy, nearly all of the consolidated estate's assets were subject to security interests held by Congress.

In the years preceding the Debtors' bankruptcy petitions, Martin Goz, Sr. a/k/a Martin Gozdenovich ("Goz"), was the president, chief executive officer and director of Target and Lance; he was also the sole pre-petition shareholder of the companies.

According to Fox, in the Fall of 1990, Goz approached Fox about the possibility of entering a business venture. *See May 30, 2000 Deposition of Thomas F. Fox* (hereinafter "Fox Dep.") at 37–40, contained in, *Certification of Joseph H. Lemkin in Support of Motion to Dismiss Complaint Pursuant to Federal Rule of Bankruptcy Procedure 7012(b)* (hereinafter, "Lemkin Cert.") at Exhibit F. Apparently, Target and Lance had been operating out of multiple buildings that were unsuited to the businesses. In an effort to improve the profitability of both Target and Lance, Goz had located and obtained a purchase option on a property in Flanders, New Jersey (the "Flanders Property"), that could house both companies, as well

as an expanded manufacturing site. *See id.* In his deposition, Fox testified that Goz was interested in finding a partner to purchase the realty and ultimately invest in the manufacturing aspect of the Debtors. *Id.* Specifically, Goz suggested that he would sell Fox a 50% interest in Lance for $300,000.00 to $400,000.00. *Id.*

Despite the initial meeting between Fox and Goz in 1990, the purchase of the Flanders Property was not consummated until 1993. *Id.* In the intervening years, Target and Lance moved their operations onto the Flanders Property. Target moved onto the property first, on or about Memorial Day of 1991. *Id.* at 44. Lance, as a manufacturer, required extensive renovations to the property before it could move in and begin operations. According to Fox, he paid for these renovations personally, by making direct payments to the contractors who performed the work. *Id.* at 45–51. Apparently, Fox spent approximately $1.35 million on improvements to the Flanders Property. *Certification of Thomas F. Fox in Support of Order to Show Cause* ("Fox Cert.") at ¶ 3, contained in, *Lemkin Cert.* at Exhibit J.

In order to acquire the Flanders Property, Fox and Goz formed a New Jersey general partnership, Landfall Associates ("Landfall"), on February 2, 1993. *Id.* at ¶ 2. Fox and Goz each owned a 50% interest in the partnership. On or about the day that Landfall was created, the Flanders Property was purchased for approximately $1,102,783.00. *See Fox Dep.* at 42; *Fox Cert.* at ¶ 3. Allegedly, the entire purchase price was paid solely by Fox.[2] *Fox Cert.* at ¶ 3.

---

**2.** Landfall Associates continued to own the property while Target and Lance conducted operations there. According to Fox, Target and Lance owed substantial past due rent to Landfall, despite being under an obligation to pay rent on an ongoing basis. This resulted in approximately $1.9 million owed to Landfall by 1999, when the Debtors filed their Bankruptcy petitions. *Fox Cert.* at ¶ 4. By order of the New Jersey state court dated July

In addition to the funds spent by Fox in acquiring and improving the Flanders Property, beginning in 1991, Fox made numerous loans and advances of operating funds to Target and Lance. *Fox Dep.* at 50–57. *See also Fox Cert.* at ¶ 5. According to Fox, these loans and advances were made "in reliance on representations and promises from Mr. Goz, which were false." Apparently, Goz would ask for more money in order to "keep things going," and Fox would advance funds "to protect my interest in the real estate. . . ." *Fox Dep.* at 53. Although these loans were made without a writing, they were subject to some degree of interest. *Id.* at 53–54. Fox's loans to the companies ultimately came to total approximately one million dollars. *Fox Cert.* at ¶ 5. The last loan was made in March of 1995. *Fox Dep.* at 59, 60, 69.[3]

As time passed and the loans were not being repaid, Fox became suspicious of Goz. *See Fox Dep.* at 53–54. Fox allegedly inquired further about acquiring an interest in Lance. In an effort to determine the true state of the company, Fox hired an accountant to conduct a business evaluation in 1995. *Id.* at 54–58. That accountant's report indicated the value of Lance to be in line with what Goz had purported it to be. Fox attempted to persuade Goz to transfer the previously discussed 50%

share of Lance, but was ultimately unsuccessful.

By 1996, Fox came to realize that the companies were not as profitable as Goz had claimed them to be. *Fox Cert.* at ¶ 11. Fox then brought in new accountants that revealed a previously unreported $1.7 million inter-company loss. *Id.* This realization coupled with a variety of other alleged malfeasances on the part of Goz caused Fox to sever their business relationship in March of 1996. *See id.*[4] In the years following 1996, Fox continued his efforts to obtain both the repayment of the monies he loaned Target and full title to the Flanders property. *Id.* at ¶ 12. However, no agreement was ever executed by Goz. *Id.*

### B. The Post–Petition History

As noted above, On December 30, 1999, Target and Lance Plastics each filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code").

Following the Debtors filing their petitions for relief, numerous motions and adversary proceedings have been filed and commenced. Only those matters relevant to the instant dispute will be noted in this recitation of fact. For the sake of clarity, the post-petition history will be broken into two periods: (1) pre-confirmation activity; and (2) post-confirmation activity.

10, 2002, title to the ·Flanders Property has been vested in Fox.

**3.** Beyond merely lending money to the Debtors, Fox also guaranteed at least one obligation that the Debtors owed to Congress. *Fox Dep.* at 73. However, Fox was never called on by Congress to repay any of Goz's debts. *Id.* at 74.

**4.** Beyond acting as a financier, between the years 1993 and 1998, Fox was employed by Target. He was initially employed as the Director of Real Estate Development. *Fox Dep.* at 61–67. In this role, Fox was responsible for facilitating the move of Target and Lance onto the Flanders Property, and winding up the companies' operations at their previous location. *Id.* Later, Fox continued in a part-time capacity, consulting and performing other work at the Debtors. *Id.* at 85–87. Fox was paid a salary for his work, and claims that no part of his salary which he received from both Target and Lance was attributable to repayment of the loans he had made to Target and Lance over the years. *Id.* at 61–67. Although not particularly relevant to the matter at bar, there appears to be some discrepancy in dates between Fox's deposition testimony and his certification.

## 1. The Pre–Confirmation Activity

Shortly after the Debtors' bankruptcy filings, on or about January 5, 2000, Target and Lance filed a Motion for an Order Pursuant to § 364(c) of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure Authorizing the Debtors (1) to obtain post-petition financing; (2) granting senior liens and priority administrative expense status; (3) modifying the automatic stay; and (4) authorizing Debtors to enter into agreements with Congress Financial ("Financing Motion"). On January 11, 2000, this Court entered an Order authorizing interim post-petition financing and permitting the Debtors to enter into agreements with Congress Financial ("Interim Financing Order"). This Court ordered two (2) extensions for the Interim Financing Order on February 1, 2000 and February 15, 2000.

On February 23, 2000, Fox filed a Notice of Appearance and Request for Service of Notice with this Court.

On February 29, 2000, this Court entered the Final Order pursuant to § 364(c) of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure Authorizing the Debtors to (1) obtain post-petition financing; (2) granting senior liens and priority administrative expense status; (3) modifying the automatic stay; and (4) authorizing debtors to enter into agreements with Congress Financial ("Final Financing Order").

Under the terms of the Final Financing Order, the Debtor's pre-petition obligations to Congress and Congress' pre-petition liens on the Debtor's collateral were deemed "recognized and allowable as valid, binding, in full force and effect, not subject to any claims, counterclaims, setoff or defenses, perfected and senior to all other liens upon and claims against the Pre–Petition Collateral with respect to all parties in this proceeding pursuant to Section 506(a) and (b) of the Bankruptcy Code," subject only to a sixty (60) day period for the official creditors' committees of Target and Lance Plastics to file objections. *Final Financing Order* at ¶ 8, contained in, *Lemkin Cert.* at Exhibit A. In addition, the Final Financing Order stated that "[Congress], and its agents, officers, directors and employees shall be deemed released and discharged from all claims and causes of action arising out of the Financing Agreements or [Congress'] relationship with Debtors prior to the entry of this Order." *Id.* The terms of the Final Financing Order were binding on "each Debtor and Lender and their respective successors and assigns, including any Trustee of other fiduciary hereafter appointed as a legal representative of such Debtor or with respect to property of the estate of such Debtor, whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case, and shall also be binding upon all creditors of each Debtor and other parties in interest." *Id.* at ¶ 31. The Final Financing Order was not appealed or otherwise modified.

On June 2, 2000, Fox commenced a lawsuit in the Superior Court of New Jersey, Chancery Division, Morris County, against Martin Goz and Congress. The action was assigned docket number MRS–C–136–00 (the "State Court Litigation"). *See Superior Court Complaint* contained in *Lemkin Cert.* at Exhibit J. In part, the lawsuit sought partition of property held by Landfall Associates in Flanders, New Jersey. According to Fox, Congress was made a party because it had a revolving mortgage encumbering the property from which the Debtor operated and Fox sought to terminate the mortgage as to future advances by Congress Financial. *See Fox Cert. in Support of Order to Show Cause* contained in *Lemkin Cert.* at Exhibit J.

On February 2, 2001, this Court entered an order substantively consolidating the bankruptcy estates of Target and Lance Plastics. Mr. Wasserman was appointed Chapter 11 Trustee.

On March 29, 2001, Congress Financial moved to lift the automatic stay to enforce their security interest in the Debtors' inventory, machinery, equipment and fixtures pursuant to N.J.S.A. 12A:9–501 ("Stay Relief Motion"). On April 9, 2001, after notice and a hearing, this Court entered a Stipulation and Order granting Congress Financial relief from the automatic stay to enforce their security interest in Debtors' inventory, machinery, equipment and fixtures pursuant to N.J.S.A. 12A:9–501 ("Stipulation and Order"). The Stipulation and Order entered into between Congress and the Trustee acknowledged the Debtors' defaults under the Final Financing Order and authorized Congress Financial to liquidate its collateral. Thereunder, the Trustee attested that in his independent business judgment, continued operation of the Debtor's business was not feasible based on operating results, lack of working capital to conduct the business, reduction in customer orders and lack of any ability to provide adequate protection to Congress Financial as required by 11 U.S.C. § 363(e). *Stipulation and Order* contained in *Lemkin Cert.* at Exhibit B. Therefore, certain equipment would be sold and applied to the debts owed Congress. *Id.*

On April 12, 2001, the Trustee, Fox, Congress and the Unsecured Creditors Committees of both Debtors agreed upon a Consent Order authorizing (1) the satisfaction of liens of Congress Financial Corporation; (2) interim post-petition loans from Thomas Fox; and (3) Related Relief (the "Fox Loan Order"), which this Court approved. Under the Fox Loan Order, Fox loaned approximately $1,300,000.00 to the Trustee. *See Fox Loan Order* contained in *Lemkin Cert.* at Exhibit C. The Trustee used these funds to fully satisfy all of Congress Financial's liens and claims against the Debtors. In return for his loan, Fox received a first priority security interest in the Debtors assets, and as additional consideration for the loan, Fox was authorized to manage the operations of the Debtors on a limited basis for the sole purpose of preserving the going concern value of the Debtors' business. *Id.* at 8. Under the terms of the Fox Loan Order, Congress assumed an affirmative duty to account to the Trustee for "any items deposited by the Debtors, but not yet collected. . . ." *Id.* at ¶ 3. In addition, Congress was required to remit any funds collected on such items to the Trustee. *Id.* Fox was responsible for all expenses of operating the Debtors' business and obligated to indemnify the Trustee from any claims made as a result of Fox's operation of the business. *Id.* at 9. Fox's authority to operate the Debtors' business was "temporary" to "cease upon the consummation of a sale of the Debtors assets under 11 U.S.C. § 363 or further Order of the Court." *Id.* at 10. However, with the exception of the duties outlined in the Order, the Fox Loan Order stated that "the obligations of the Debtors to Congress are without defense, counterclaim, setoff or rights of recoupment of any kind." *Id.* at 2.

On June 15, 2001, upon the Trustee's application to sell property free and clear of any liens, this Court entered an Order authorizing the Chapter 11 Trustee to sell substantially all of the Debtors' assets to Mr. Fox pursuant to 11 U.S.C.A. § 363(b) ("Sale Order"). Under the Sale Order, Mr. Fox or his designee was to purchase the Debtors' assets for total sum of $1,930,000.00 plus a percentage of any recovery in the so-called "Goz Family Actions" as set forth therein, subject to relevant adjustments. Part of the purchase

price included a $1,300,000.00 credit for the loan Fox made pursuant to the Fox Loan Order. Debtors' assets were sold to a corporation wholly owned by Fox, Target Holdings, Inc ("Target Holdings"). Target Holdings, the designee, is authorized under state law to operate as Target Industries, Inc. In addition to the purchase of the Debtors' assets, the Sale Order authorized Mr. Fox to pursue certain causes of action. Specifically, paragraph 3 of the Sale Agreement Term Sheet incorporated by reference in the Sale Order states:

*AUTHORITY TO PURSUE LITIGATIONS.* The Trustee shall authorize Fox, at his sole expense, to pursue, on behalf of the Trustee and the Bankruptcy Estate, all causes of action, claims, demands and rights of the Trustee, the Debtors or the Bankruptcy Estates:

(a) against *any person* arising from the Proprietary Assets[5] and any attempts to interfere with the Trustee's or Fox's attempt to continue the business of the Debtors ("Business Interference Actions"), except as otherwise specifically excluded herein; and

(b) against Martin Gozdenovich a/k/a Martin Goz and Martin Goz Sr., Martin A. Gozdenovich a/k/a Martin A. Goz and Martin Goz, Jr. or any relative of Martin Goz or Martin A. Goz for breach of duty to the Debtors or the Bankruptcy Estate or any transfers avoidable under the Bankruptcy Code ("Goz Family Actions"), except as otherwise specifically excluded herein; provided, however, that the Trustee shall does not [sic] authorize Fox to pursue any criminal claims, actions or

causes of action which the Trustee, the Debtors or the Bankruptcy Estates may have against *any person.*

*Sale Order* at Exhibit B, Sale Agreement Term Sheet, ¶ 3, contained in *Lemkin Cert.* at Exhibit D. [Emphasis added].

The Sale Agreement Term Sheet also states:

*RELEASE OF CLAIMS.* In addition to the other consideration provided herein, the Trustee and Fox shall release each other from all claims and causes of action, including but not limited to the following:

(a) The Trustee shall release any claims of the Trustee, the Debtors or the Bankruptcy Estates against Thomas Fox and Landfall Associates, including but not limited to, the claims raised in the adversary proceeding styled, *Target Industries, Inc. and Lance Plastics, Inc. v. Thomas F. Fox,* Adversary Proceeding No. 00–3207.

(b) Fox shall release any claim he has against the Trustee, the Debtors or the Bankruptcy Estates, including but not limited to any right to receive any distribution from the Debtors or the Bankruptcy Estates on account of any claim held by Thomas Fox or any partnership, corporation or unincorporated entity in which he has an interest, including but not limited to, Landfall Associates; provided, however, that Landfall Associates shall be entitled to retain the rents the Debtor and the Trustee paid to Landfall Associates since the Petition Date.

---

**5.** The Sale Order defines "Proprietary Assets" as "all trade names, trade dress, customer artwork, printing plates, logos, customer product specifications, customer lists, price lists and other confidential and proprietary information and trade secrets of either of the Debtors." *Sale Order,* Exh. B, Sale Agreement Term Sheet at ¶ 2(f).

*Sale Order* at Exhibit B, Sale Agreement Term Sheet, ¶ 8, contained in *Lemkin Cert.* at Exhibit D.

On August 15, 2001, the Trustee filed a Chapter 11 Plan and Disclosure Statement. This Court, after notice and a hearing, approved the Disclosure Statement by Order dated November 27, 2001 ("Disclosure Statement Order").

On January 3, 2002, Andrew J. Kyreakakis, Mr. Fox's counsel in this matter, sent a letter and proposed order to counsel for the Defendant, concerning the State Court Litigation ("1/3/02 Letter" contained in *Plaintiffs' Cross–Motion,* Fox Affidavit, Exhibit B). The letter discussed the proposed dismissal of Congress from the State Court Litigation, but noted that "there are other issues between our clients, including but not limited to the fact that Congress continues to hold funds which we believe belong to the Debtors as well as our objection to a proof of claim filed by Congress which we believe should be expunged. The proposed order preserves our rights in the Bankruptcy proceeding. . . ." *Id.* The proposed order attached to the letter provided for the dismissal of the State Court Litigation against Congress "without prejudice to the preservation of any rights Thomas F. Fox or the Chapter 11 Trustee for the Debtors have against Congress Financial Corporation" in the instant bankruptcy proceeding. *Id.*

On April 18, 2002, after notice and a hearing, this Court entered an Order confirming the Amended Chapter 11 Plan for the Debtors Proposed by the Chapter 11 Trustee of the consolidated Debtor estates ("Confirmation Order"). Under the Confirmation Order, the Goz Family Actions and the Business Interference Actions as defined in Exhibit B defined of the Sale Order vested in the Trustee subject to the authority of Fox and Target Holdings to prosecute those claims pursuant to the Term Sheet and Sale Order. The Trustee retained the sole authority to pursue other claims belonging to the Estate. *Confirmation Order* at ¶ 10, contained in *Lemkin Cert.* at Exhibit E.

The Amended Chapter 11 Plan classified Congress' claim as a Class 2 secured claim. *See* Plan at p. 21. The Plan provided:

The Allowed Congress Secured Claim is and shall be unimpaired under the Plan. In full satisfaction of the Allowed Congress Secured Claim, Congress has been paid $1,300,000 pursuant to the Fox Loan Order. Congress shall receive no further distribution on account of the Congress Secured Claim.

*Id.* at 21.

The Plan further provided:

As provided in the Term Sheet and the Sale Order, after the Confirmation Date, Fox and Target Holdings shall be authorized to pursue the Business Interference Actions and the Goz Family Actions on behalf of the Trustee at the sole expense of Fox and Target Holdings. If Fox or Target Holdings recovers any judgment or reaches a settlement in any of the Business Interference Actions or the Goz Family actions, Fox or Target Holdings shall pay to the Disbursing Agent twenty-five percent (25%) of any amount paid on account of that judgment or settlement after all fees and expenses incurred by Fox and Target Holdings in obtaining the payment and the judgment or settlement.

After the Confirmation Date, the Trustee shall have the sole power and authority to prosecute, to defend or not to defend and to settle or not to settle the Estate Claims. The Trustee shall deliver all Recoveries on any Estate Claims, less the fees and expenses of the

Plan Professionals in pursuing the Estate Claims, to the Disbursing Agent. Plan § 8.2.

## 2. Post–Confirmation Activity

None of the Parties offered objections to the Confirmation Order. Instead, on April 26, 2002, the Plaintiffs filed the instant Complaint against numerous plaintiffs including Congress, Mr. Goz, and a number of fictitious corporate and individual defendants.

Factually, the Complaint can be separated into three principal areas: Congress' relationship with the Debtors; the repayment of Congress' loans to the Debtors; and the alleged diversion of the Debtors' assets. With respect to Congress' relationship with the Debtors, the Complaint alleges that Congress loaned money to Target and Lance when Congress "knew or should have known that the Debtors' financial situation did not support the financing it provided to Debtors" *Id.* at ¶ 4; that "Congress failed to make the proper investigation, audits and due diligence before advancing funds to Debtors when they were under Goz's control ... and failed to make a proper investigation which would have revealed that Target's purchase orders and other assets were being diverted to others." *Id.* at ¶ 8. In addition, the Complaint asserts that Congress required Mr. Fox and others to sign "agreements, mortgages and other documents to secure the loans." According to the Complaint, as a result of Congress' actions:

Mr. Fox was led to believe that Debtors were financially sound and was therefore induced to lend substantial monies to the Debtors which he has lost. He also lost substantial rental payments which Debtors had accrued but ultimately could not pay. If Mr. Fox had known the true facts of Debtors' financial condition, Mr. Fox would have taken action sooner which would have saved him substantial monies. Mr. Fox also had to pay substantial sums to pay off Congress' loans when Debtors were no longer able to pay for the financing. Mr. Fox was also damaged by Congress' tying up real estate owned by Landfall Associates (of which Mr. Fox was a 50% owner). Congress' improper conduct and frivolous positions also caused Mr. Fox to incur substantial legal fees and costs.

*Complaint* at ¶ B(9).

The Complaint also recites the obligations that Congress incurred as a result of the April 12, 2001, Fox Loan Order and alleges that Congress has yet to comply with these obligations. Specifically, the Complaint alleges that Congress has failed to (1) deliver to the Trustee all loan documents, including, notes, mortgages, and other documents requested by the Trustee, marked canceled and discharged; (2) account for any items deposited by the Debtors, but not yet collected as of April 11, 2001; (3) remit to the Debtor any funds it collected on and after April 12, 2001; (4) accrue interest on the amounts in deposit; and (5) provide information regarding funds it received from Martin Goz's guarantee of the Debtors' obligations to Congress and any participation by Goz in Congress' financing to Debtors ("Goz's participation funds"). *Id.* at ¶ C 1–5.

The Complaint asserts numerous ways in which the Debtors' assets were diverted by "Mr. Goz, along with others." *Id.* at ¶ D 1. However, Congress is not named as an active participant in the diversion of assets. Instead, the Complaint alleges that "Congress failed to uncover this misappropriation of assets." *Id.* at ¶ D 2.

In terms of legal allegations, the Complaint is composed of thirteen counts alleging a variety of claims. The claims asserted in the first six counts of the Complaint, misappropriation of assets (First Count),

turnover of funds (Second Count), avoidance of post petition transfers (Third Count), conversion (Fourth Count), accounting and turnover of funds (Fifth Count), and constructive trust (Sixth Count), all relate to Congress' alleged failure to comply with the terms of the Fox Loan Order. The Seventh Count of the Complaint alleges that Congress breached a fiduciary duty owed to Target, Lance, and Mr. Fox as guarantor of the companies' obligations, through Congress' wrongful conduct. The Eighth Count of the Complaint asserts that Congress breached its contractual obligations to the Debtors and to Mr. Fox by virtue of its wrongful conduct. The Ninth Count alleges that Congress' and Goz' conduct constitutes "a breach of the implied covenant of good faith and fair dealing implicit in their agreements and dealings with Debtors and Mr. Fox." The Tenth Count sounds in conspiracy, alleging that Congress, Goz, and the other defendants "conspired to conceal the true financial condition of the Debtors" and "induced Mr. Fox to lend money, sign mortgages on real estate in which he has an ownership interest, guarantee loans, and take other actions to his detriment." The Eleventh Count alleges Fraud. Specifically, the Plaintiffs allege that Congress knowingly made material misrepresentations regarding the Debtors' financial condition to Mr. Fox with the intent to deceive and the intent that Mr. Fox rely on them. Moreover, the Complaint alleges that Mr. Fox did so rely on Congress' material misrepresentations to his detriment. The Twelfth Count of the Complaint seeks to pierce the corporate veil and attach Mr. Goz' assets directly. Finally, the Thirteenth Count alleges violations of both the New Jersey and Federal RICO statutes by Congress, Goz, and the other defendants.

On June 13, 2002, Congress moved to dismiss the instant adversary proceeding asserting, *inter alia*, that the Complaint failed to state a claim for which relief could be granted, and that the Complaint was barred by the doctrines of res judicata and judicial estoppel.

In response, the Plaintiffs filed a cross-motion on July 1, 2002, opposing Congress' motion to dismiss and seeking to compel Congress' compliance with the Fox Loan Order. In their cross-motion, Plaintiffs assert that they had in their possession a transcript and tape of a telephone call between Jeanette (Jean) Milman, a former Target employee, and Mr. Goz that implicated Congress in post-petition wrongdoing (the "Milman Tapes").

Congress then filed a Motion in Limine to Suppress the Milman Tapes on July 24, 2002. Therein, Congress argues that the transcript and tape constitute inadmissible hearsay, have not been properly authenticated, and are more prejudicial than probative and should be excluded pursuant to Rule 403 of the Federal Rules of Evidence. Congress also asserts that if the tape was obtained in violation of the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J.S.A. 2A:156A–1, et seq., additional grounds exist for suppression. Congress further contends that the Plaintiffs are attempting to convert the instant motion to dismiss into one for summary judgment by proffering the Milman Tapes.

On August 7, 2002, Plaintiffs filed a Brief in Opposition to Defendant's Motion to Suppress and in Further Support of Plaintiffs' Cross–Motion and in Opposition to Motion to Dismiss Adversary Proceeding ("Plaintiff's Opposition to Motion to Suppress").

A supplemental certification of Thomas Fox in opposition to Congress' motions was also filed contemporaneously with the Plaintiff's Opposition to the Motion to Suppress ("Fox Supplement"). Attached to

this Fox Supplement is an appraisal entitled, "Machinery and Equipment Orderly Liquidation Value Appraisal Report" prepared by Daley–Hodkin Appraisal Corporation for Ms. Terese Gatto, President of Congress Financial Corporation, in March 1999. Mr. Fox alleges that the appraisal report is proof that Congress Financial knew about the Debtor's poor financial condition without apprising Fox.

Defendant Martin Goz, Sr. filed his Answer to the Complaint on August 22, 2002.

On December 16, 2002, this Court held a status conference and allowed the Defendant to submit a memorandum to support its statute of limitations defense which had not previously been raised. On January 17, 2003, Defendant complied and argued that because Mr. Fox' last loan to the Debtors was on or about December 5, 1995, his claims are time-barred. On January 21, 2003, Plaintiffs filed their reply in opposition, asserting that the causes of action plead in the complaint were not discovered until 2001, more particularly, in June 2001 when Fox took over the operating of the Debtor and May 2001 when the Trustee and Fox received the Millman Tapes. Therefore, according to the Plaintiffs' position, the statute of limitations does not bar the instant suit.

On January 30, 2003, this Court heard oral arguments on the motions and reserved decision.

Subsequent to the oral argument, the parties, with leave of Court, submitted supplemental briefs.

On February 28, 2003, this Court issued, upon consent of Congress, an Order to Compel Accounting in accordance with the Fox Loan Order. Thereafter, on March 4, 2003, Congress submitted the Certification of Terese K. Gatto, Vice–President of Congress, which purportedly contained the

requisite accounting. However, a subsequent letter to the Court from Mr. Fox's counsel dated September 5, 2003 indicates that the accounting provided is inadequate.[6]

### DISCUSSION

Given the wide ranging allegations of the Complaint, and the multitude of parties involved, it is necessary to carefully consider the scope of this opinion. First, although the Motion to Dismiss apparently seeks dismissal of the entire complaint, at oral argument, counsel for Congress conceded that to the extent the Complaint sought compliance with the obligations incurred under the April 21, 2001 Fox Loan Order, dismissal of those Counts was inappropriate. Upon a careful review of the Complaint, it appears that Counts I through VI of the Complaint seek Congress' compliance with the April 21, 2001 Fox Loan Order. Therefore, the resolution of these six counts is outside the purview of this motion. As to Plaintiffs Cross–Motion to Compel Compliance with this Court's April 12, 2001 Order and for Fees, although it appears that some attempts at compliance have been made, the final resolution of these matters will be determined by further proceedings, as necessary, within the context of this Adversary Proceeding. In addition, Count XII, entitled "Piercing the Corporate Veil," is not at issue because it implicates Goz alone, making no reference whatsoever to Congress. Therefore, the only counts under consideration at this time in connection with the Motion to Dismiss are the Seventh (Breach of Fiduciary Duty), Eighth (Breach of Contract), Ninth (Breach of the Implied Covenant of Good Faith and Fair Dealing), Tenth (Conspiracy), Eleventh (Fraud), and Thirteenth (RICO) Counts.

---

6. In fact, numerous post hearing letters have been filed by both parties.

With these parameters, the Court will consider the instant Motion to Dismiss.

### A. Jurisdiction

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. The District of New Jersey is the proper venue pursuant to 28 U.S.C. §§ 1408 and 1409.

### B. Standard for Dismissal Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this proceeding by Bankruptcy Rule 7012(b), a party may move to dismiss a complaint for failure to state a claim upon which relief may be granted. *Fed. R. Civ. Proc.* 12(b)(6); *Bankr.R.* 7012(b). A motion made under Rule 12(b)(6) challenges the legal sufficiency of a claim in order to determine whether it should proceed. *Morris v. Azzi,* 866 F.Supp. 149, 152 (D.N.J.1994). "The purpose of the rule is to allow the court to eliminate actions that are fatally flawed in their legal premise and destined to fail, and thus spare the litigants the burdens of unnecessary pretrial and trial activity." *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys.,* 988 F.2d 1157, 1160 (Fed.Cir.1993), *reh'g en banc denied, Hess v. Advanced Cardiovascular Systems, Inc.,* 520 U.S. 1277, 117 S.Ct. 2459, 138 L.Ed.2d 216 (1997).

In considering a Rule 12(b)(6) motion, the reviewing court must accept all of the factual allegations contained within the complaint as true. *See U.S. v. Gaubert,* 499 U.S. 315, 327, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). In addition, all reasonable inferences should be drawn in favor of the plaintiff. *See Gary v. Air Group, Inc.,* 397 F.3d 183, 186 (3d Cir. 2005). Ultimately, dismissal is appropriate only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

The Rule 12(b)(6) motion to dismiss is very limited in terms what may be considered from an evidentiary standpoint. Specifically, the language of Rule 12(b) provides:

> If, on a motion ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material pertinent to such a motion by Rule 56.

F.R.C.P. 12.

Given this narrow scope, a court hearing a Rule 12(b)(6) motion will "generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Industries,* 998 F.2d 1192, 1196 (3d Cir. 1993). In addition, "a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997).

In the course of presenting their arguments, both Congress and the Plaintiffs have introduced matters that fall outside the appropriate scope of a Rule 12(b)(6) motion. However, converting the instant motion into one for summary judgment would be both premature and inappropriate. As the Complaint is presently written, the allegations must be carefully sorted out. Before any adjudication on the merits can take place, it is necessary to

clarify the claims presented in the Complaint. Therefore, the Court will disregard the parties' submissions that fall outside of the pleadings, matters of public record, and documents relied on by the Complaint, and determine the motion within the strictures of Rule 12(b)(6).

### C. The Instant Motion to Dismiss

Congress has argued that the Complaint must be dismissed because it asserts claims that are barred by the doctrines of *res judicata* and judicial estoppel. *Congress' Brief* at 2. In support of this position, Congress points to the Confirmation Order and underlying confirmed amended Chapter 11 Plan which treats Congress' claim as secured and paid in full, but does not reserve any causes of action against Congress. *See id.* at 11–18. According to Congress, in the absence of such a reservation, the cause of action is now lost to the Trustee, his successors and assigns. *Id.* In addition, Congress argues that Fox's claims are barred because they contradict his previously asserted positions in this bankruptcy proceeding.

Independent of Congress' *res judicata* and judicial estoppel arguments, Congress asserts two additional grounds for dismissal: (1) that the Complaint itself fails to state a claim upon which relief may be granted; and (2) the RICO related Counts of the Complaint suffer from fatal pleading deficiencies. *Id.* at 19–26. Finally, Congress has claimed that the Plaintiffs' claims are barred by the applicable statutes of limitation.

In contrast, Fox asserts that neither *res judicata* or judicial estoppel bar the present suit. *See generally Fox Brief.* Moreover, Fox argues that the complaint suffers from no infirmities sufficient to warrant dismissal. *Id.* Similarly, Fox disputes Congress' argument concerning the statute of limitations.

As plead, the Complaint has two plaintiffs: Fox and the Trustee. Each of the Counts at issue is brought in the name of both plaintiffs. Therefore, this Court must first determine whether either of the Plaintiffs is barred by *res judicata* or judicial estoppel from bringing suit on these claims.

#### 1. Res Judicata

The doctrine of *res judicata* (or claim preclusion) provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 93, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). As stated by the Third Circuit, three basic circumstances must exist in order for *res judicata* to apply: "(1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action." *Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992).

Although the contours of a bankruptcy case make its application somewhat more difficult than in other contexts, the doctrine of *res judicata* is fully applicable to bankruptcy court decisions. *See Katchen v. Landy*, 382 U.S. 323, 334, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). Moreover, *res judicata* is applicable to final orders issued by the bankruptcy court. *See, e.g., NovaCare Holdings, Inc. v. Mariner Post–Acute Network, Inc. (In re Mariner Post–Acute Network, Inc.)*, 267 B.R. 46, 52–53 (Bankr.D.Del.2001) (citing numerous cases for the proposition that final orders of a bankruptcy court are given *res judicata* effect). Specifically, *res judicata* has been held applicable to financing orders, claims allowance orders, and confirmation orders.

*See NovaCare Holdings, Inc.,* 267 B.R. at 52–53 (financing orders); *Katchen,* 382 U.S. at 334, 86 S.Ct. 467 (claims orders); *Donaldson v. Bernstein,* 104 F.3d 547, 554 (3d Cir.1997) (confirmation orders).

■ As noted above, bankruptcy cases require a careful application of *res judicata.* Although the first two prongs of the doctrine will usually be readily apparent, the third prong, whether the present suit is based on the previous cause of action, is usually far less clear. Within the Third Circuit, a cause of action should be barred only where "the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum." *Eastern Minerals & Chemicals Co. v. Mahan,* 225 F.3d 330, 337–38 (3d Cir.2000).

In the present matter, Congress claims that there are at least five orders of this Court which preclude the instant action by the Trustee and Fox under the principle of *res judicata:* (1) the Final Financing Order; (2) the Stipulation and Order granting Congress Relief from the Automatic Stay; (3) the Fox Loan Order; (4) the Sale Order; and (5) the Confirmation Order. The *res judicata* effect of each of these orders will be considered in turn. Then, each count of the Complaint will be considered to determine if any of the present claims must fail under *res judicata.*

### a. The Final Financing Order

■ Pursuant to a Motion filed on behalf of the Debtors, the Final Financing Order was entered by this Court on February 29, 2000. The Final Financing Order clearly decided three matters relevant to the case at bar: (1) Congress' prepetition liens and claims were fully valid; (2) Congress was "released and discharged from all claims and causes of action arising out of the Financing Agreements or [Congress'] relationship with the Debtors prior to the entry of this Order;" and (3) the Final Financing Order was binding on the Trustee, the Debtors, and their successors and assigns. *Final Financing Order* at ¶ 8, 31. Here, the Complaint is brought by both the Trustee and Fox against Congress.

Under the principles of *res judicata* espoused by the Third Circuit in *Eastern Minerals,* the Trustee would be precluded from bringing a claim against Congress that logically should have been raised when the Motion requesting the entry of the Final Financing Order was submitted to the Court. Similarly, Fox would be precluded from bringing any such claim to the extent that he sues as a successor in interest to the Debtors. Given the broad release contained within the Final Financing Order, in the event that the Debtors held any claim against Congress arising out of their pre-petition relationship, it would have been patently unreasonable not to bring such claims, or at least highlight their existence, prior to the entry of the Final Financing Order. Therefore, the Trustee is barred from now raising any claim based on the pre-petition lending relationship between Congress and the Debtors. Fox is similarly barred from bringing any such claim as a successor in interest to Target and Lance.

### b. The Stipulation and Order Granting Congress Relief from the Automatic Stay

■ The Stipulation and Order resolved Congress' Motion for Relief from the Automatic Stay. Similarly, in the event the Debtor estates held claims against Congress arising out of their prepetition relationship, it would have been particularly untenable not to bring such claims, or

raise such claims, at that time. Therefore, the Trustee is barred from raising any claims based on the prepetition lending relationship between Congress and the Debtors and Fox is barred from bringing such claims as a successor in interest to Target and Lance.

### c. The Fox Loan Order

Similar to the Final Financing Order, the Fox Loan Order with limited exception provided that the obligations of the Debtors to Congress are without defense, counterclaim, setoff or rights of recoupment of any kind. Therefore, the scope of claims that would be barred under a *res judicata* analysis would not be enlarged or otherwise altered from those already barred as a result of the Final Financing Order.

### d. The Sale Order

Similar to the aforementioned order, the Sale Order resulted in the allowance and satisfaction of Congress' claims. Here as well, if the Debtors held claims against Congress arising out of their prepetition relationship, it would have been patently unreasonable not to raise such claims at that time. As such, the Trustee is barred from raising any claims based on the prepetition lending relationship between Congress and the Debtors and Fox is barred from bringing such claim as a successor in interest to Target and Lance.

### e. The Confirmation Order

It is a well accepted principle that "a confirmation order is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation." *Donaldson v. Bernstein,* 104 F.3d 547, 554 (3d Cir.1997) (quoting *In re Szostek,* 886 F.2d 1405, 1408 (3d Cir.1989)). This includes causes of action predicated on pre-confirmation activity that could have been raised prior to confirmation.

*See id.* Creditors whose claims arise from and after confirmation are not barred by the event of confirmation from asserting such claims, except to the extent that they arise from pre-confirmation acts. *Id.* at 555.

The Confirmation Order and the Debtors' Plan of Reorganization are absolutely silent as to any counterclaim, defense or cause of action against Congress relating to its secured status. Although, for instance, the Fox Loan Order and the Final Financing Order dealt specifically with lending relationship between Congress and the Debtors' estates, the *res judicata* effect of the Confirmation Order must be viewed as being broader in scope. *See Donaldson,* 104 F.3d at 554. Those causes of action that the Trustee could reasonably have asserted on behalf of the Debtors' estates against Congress should have been raised at confirmation. By treating Congress' claim as secured and remaining silent as to an existing cause of action that could have reduced the amount owed to Congress, the Trustee lost the opportunity to assert such claims post-confirmation. The Confirmation Order, however, expressly reserves the right of Fox, on behalf of the Trustee and the Estate, to bring both the "Business Interference Actions" and the "Goz Family Actions." In addition, the Confirmation Order did not bar any claim *personally* held by Fox against Congress. Such claims would, arguably, not affect the estate or otherwise disturb the effect of the Confirmation Order. *See Donaldson,* 104 F.3d at 555, citing *Matter of Newport Harbor Assocs.,* 589 F.2d 20, 24 (1st Cir.1978) ("res judicata would not bar a common law action for damages for fraud 'where the alleged fraud could not have been asserted in the bankruptcy proceeding, the underlying factual claims were not actually adjudi-

cated, and the relief sought would not upset the confirmed plan of arrangement' ").[7]

### d. Effect of Res Judicata Analysis on the Complaint

The foregoing analysis demonstrates that neither the Trustee nor Fox, as successor in interest to Target and Lance, may pursue any claim that the Debtors or Debtor estates could have asserted against Congress pre-confirmation. However, Fox is entitled to bring any claims that he holds in his personal capacity against Congress, regardless of whether they accrued pre or post-confirmation. In addition, Fox may pursue any claim that falls within the causes of action explicitly reserved in the Confirmation Order, to wit, the Business Interference Actions and the Goz Family Actions. With this in mind, the Complaint will now be considered.

The Seventh Count of the Complaint asserts that "Congress owed a fiduciary duty to the Debtors and to Mr. Fox, as a guarantor of many of the financing documents and as a mortgagor of real estate in which he had an interest which was pledged for the financing to Debtors." *Complaint* at Seventh Count, ¶ 2. Congress allegedly breached this fiduciary duty, harming the both the Debtors and Fox. *Id.* at ¶ 3. Any fiduciary duty Congress owed to the Debtors would necessarily have arisen out of the their pre-confirmation lending relationship. As no lending relationship continued post-confirmation, *res judicata* bars this claim from being brought on behalf of the Debtors. However, Fox would be entitled to the assert this claim against Congress, but only for a breach of fiduciary duty that Congress owed to him personally.

The Eighth Count of the Complaint asserts that "Congress breached its contractual obligations to the Debtors and Mr. Fox," by virtue of Congress' "wrongful conduct" constituting a breach of contract. *Complaint* at Eighth Count, ¶ 2, 3. As a result, the Complaint alleges that "Target and Lance have been harmed and have suffered and continue to suffer damages." *Id.* at 4. Pursuant to the Final Financing Order, the Stipulation and Order granting Congress Relief from the Automatic Stay, the Fox Loan Order, the Sale Order and the Confirmation Order, all contractual obligations between Congress and the Debtors were fully satisfied. Although Fox could pursue this claim against Congress on the basis of a contractual obligation due Fox personally, the Eighth Count does not allege any harm to Fox. The only wrong this claim seeks to redress is harm to the Debtors. Because *res judicata* bars all of the debtors' claims based on the pre-confirmation activity, neither the Trustee nor Fox may now seek to vindicate those rights. Therefore the Eighth Count as presently drafted is subject to dismissal. This Court will grant leave to Fox to amend the Complaint to the extent he intends to assert personal claims based on breach of contract.

The Ninth Count of the Complaint asserts that "Congress' and Goz's wrongful conduct constitutes a breach of the implied covenant of good faith and fair dealing implicit in their agreement and dealings with Debtors and Mr. Fox." As a result of this breach, the Complaint alleges that the Debtors and Fox have been damaged. Similar to the Seventh Count, the Ninth Count relies on an obligation that arises from the lending relationship between Congress and the Debtor. This claim is

---

**7.** It is arguable, however, as to whether this Court would have possessed jurisdiction to adjudicate such claims in the first instance. This is an issue that is reserved for another day.

specifically barred by the *res judicata* effect of the Final Financing Order. Moreover, the action is precluded by the Confirmation Order. Although the Trustee is wholly barred from maintaining such a claim against Congress, Fox would be entitled to the assert the claim alleged in the Ninth Count, but only for a breach of the implied covenant of good faith and fair dealing that existed between Congress and Fox in his personal capacity.

The Tenth Count of the Complaint sounds in conspiracy. According to the Complaint, Congress and Goz, along with others, conspired to conceal the true financial condition of the Debtors, thereby inducing "Mr. Fox to lend money, sign mortgages on real estate in which he has an ownership interest, guarantee loans, and take other actions, to his detriment." Even though the Complaint asserts that the "plaintiffs" were harmed by the alleged conspiracy, only a harm to Fox is stated in the Complaint. As none of the Orders at issue preclude Fox from bringing a personal cause of action against Congress, the Tenth Count should be allowed to proceed. However, by virtue of the Confirmation Order, this count may not be maintained by the Trustee as it deals with Congress' pre-confirmation actions.

The Eleventh Count alleges that Congress made knowingly false representations concerning the financial health of the Debtors with intent to deceive that Fox relied on to his detriment. Similar to the Tenth Count, this claim is a personal cause of action belonging to Fox. Therefore, no *res judicata* bar exists to Fox pursuing the claim. However, because the claim involves the pre-confirmation actions of Congress, the count must be dismissed as to the Trustee.

The Thirteenth and final count of the Complaint alleges a violation of both the New Jersey and Federal RICO statutes. Although the count is plead is conclusory and vague terms, the crux of the allegation appears to be that "Defendants unlawfully misappropriated and converted to the benefit of the Enterprise assets of Lance and Target." *Complaint* at Thirteenth Count, ¶ 5. Although some of the acts may have taken place pre-confirmation, the claim may arguably fall into the category of "Business Interference Actions" that the Confirmation Order specifically authorizes Fox to pursue on behalf of the Trustee. Therefore, *res judicata* does not require the dismissal of the Thirteenth Count.

In summary, the Seventh, Eighth, Ninth, Tenth, and Eleventh Counts may still be pursued by Fox against Congress in a limited fashion. Specifically, Fox may pursue these claims against Congress in his personal capacity. However, the Trustee may not assert these claims against Congress on behalf of the Debtors' Estates. Ultimately, only the Thirteenth Count of the Complaint survives the *res judicata* analysis intact.

### 2. Judicial Estoppel

In addition to the *res judicata* arguments already addressed, Congress has argued that the Plaintiffs' claims are barred by the doctrine of judicial estoppel. Specifically, Congress asserts that up until the filing of the instant complaint, the Plaintiffs advanced positions that are in direct contradiction to the claims asserted under the Complaint.

The doctrine of judicial estoppel prevents a party from advancing inconsistent positions in order to gain an advantage in litigation. *Whiting v. Krassner*, 391 F.3d 540, 544 (3d Cir.2004). As stated by Supreme Court, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that

position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895). The basic reason for applying judicial estoppel is to "protect the integrity of the judicial process by prohibiting parties from deliberately changing position according to the exigencies of the moment." *New Hampshire v. Maine,* 532 U.S. 742, 749–50, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (citations omitted).

 Within the Third Circuit, three requirements must be met before judicial estoppel may be applied:

> First, the party to be estopped must have taken two positions that are irreconcilably inconsistent. Second, judicial estoppel is unwarranted unless the party changed his or her position "in bad faith—i.e., with intent to play fast and loose with the court." Finally, a district court may not employ judicial estoppel unless it is "tailored to address the harm identified" and no lesser sanction would adequately remedy the damage done by the litigant's misconduct.

*Montrose Medical Group Participating Savings Plan v. Bulger et al.,* 243 F.3d 773, 779–80 (3d Cir.2001). *See also In re Oneida Motor Freight,* 848 F.2d 414 (3d Cir.1988).

In the course of conducting the judicial estoppel analysis, equity requires that a party to be estopped be given a meaningful opportunity to explain why their position has changed. *Krystal Cadillac–Oldsmobile GMC Truck, Inc. v. General Motors Corp.,* 337 F.3d 314, 320 (3d Cir. 2003).

 In order to apply this analysis to Fox's present position, as embodied in the Complaint, Fox's prior representations and positions must be considered. In the State Court Litigation, Fox sued both Goz and Congress. However, no claims for misrepresentation were asserted against Congress. According to Fox's complaint in the State Court Action, Fox relied on representations made by Goz when Fox loaned money to the Debtors. Congress was included in the suit solely because of its role as mortgagee of the Flanders property. Later, in a Rule 2004 deposition taken in the course of this bankruptcy proceeding, Fox testified that he relied on Goz's representations when he extended loans to Target.[8] In fact, Congress would urge, up until the filing of the Complaint, Fox never indicated that Congress had behaved improperly.

Now, Fox alleges that Congress violated numerous duties that Congress owed to Fox. In addition, Fox has asserted that Congress, along with Goz, is involved in a conspiracy to pirate the business of the Debtors.

It is not clear that any of the allegations in the Complaint are in direct contradiction with any of Fox's previous positions. Fox previously asserted that he relied on Goz in making loans. However, that does not necessarily exclude the possibility that Fox also relied on certain representations made by Congress. Moreover, Fox has claimed that new information was recently discovered that brought Congress' alleged wrongdoing to light. Although the

---

**8.** In addition to the positions advanced in the State Court Litigation, the Defendant argues that Fox asserted positions in this bankruptcy case that supported the validity of Congress' liens on the Debtors' property. This Court has already determined that *res judicata* bars all claims against Congress by the Debtors or their successors in interest arising out of their lending relationship.

accuracy of Fox's position may be refuted by subsequent discovery, at this early stage, there is insufficient ground to discount his assertions. Therefore, this Court cannot conclude that Fox is attempting to play "fast and loose with the courts" at this point in time. Fox's present surviving claims are not barred by the doctrine of judicial estoppel.

### 3. The Legal Sufficiency of the Remaining Claims

Now that the scope of the Complaint has been narrowed by the *res judicata* and judicial estoppel analysis, the Court will consider the legal sufficiency of the remaining claims. As noted at the outset of this discussion, the Rule 12(b)(6) motion to dismiss tests the facial validity of a claim. This is an exceedingly high standard. A claim may be dismissed only where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

 The Seventh Count of the Complaint alleges that "Congress owed a fiduciary duty to the Debtors and to Mr. Fox, as a guarantor of many of the financing documents and as a mortgagor of real estate in which he had an interest which was pledged for the financing to Debtors." *Complaint* at Seventh Count, ¶ 2. Congress allegedly breached this fiduciary duty, harming Fox. *Id.* at ¶ 3. Dismissal pursuant to Rule 12(b)(6) would be appropriate only if Fox could prove no set of facts that would allow him to recover. However, a fiduciary relationship between Congress and Fox may ultimately exist on the basis of the loan documents or other set of facts. *See* 70 A.L.R.3d 1344 ("[A]s banking practices have changed, increasing recognition has been given to the view that certain bank-customer relationships—often

characterized in general terms by the courts as relationships going beyond the conventional bank-depositor relationship, or as relationships of trust and confidence—may impose a fiduciary duty upon the bank to disclose facts when dealing with the customer.") In addition, it is conceivable that Congress did breach a duty owed pursuant to such a relationship. Therefore, dismissal of the Seventh Count is inappropriate at this time.

 The Eighth Count sounds in breach of contract. The Ninth Count of the Complaint asserts that "Congress' and Goz's wrongful conduct constitutes a breach of the implied covenant of good faith and fair dealing implicit in their agreement and dealings with Debtors and Mr. Fox." As a result of this breach, the Complaint alleges that Fox has been damaged. Lenders are bound by an implied covenant of good faith and fair dealing by virtue of their contractual relationship with a guarantor. *See e.g., Lee v. LPP Mortg. Ltd.,* 74 P.3d 152, 161 (Wyo.2003). Moreover, facts proving that Congress' conduct constituted breach of contract and/or breach of the covenant of good faith and fair dealing could exist. Therefore, the Eighth Count to the extent that it is amended to assert personal claims of Fox and the Ninth Count state claims upon which relief may be granted and will not be dismissed at this time.

 According to the Tenth Count of the Complaint, Congress and Goz, along with others, conspired to conceal the true financial condition of the Debtors, thereby inducing "Mr. Fox to lend money, sign mortgages on real estate in which he has an ownership interest, guarantee loans, and take other actions, to his detriment." If Congress and Goz acted in concert to conceal the financial condition of the Debtors in order to induce Fox to guarantee debt, Fox would possess a valid cause of

action. Therefore, the Tenth Count is sufficient to survive a Rule 12(b)(6) dismissal.

The Eleventh Count sounds in fraud. In addition to the normal considerations of a Rule 12(b)(6) motion, an allegation of fraud must also meet the heightened pleading standard of Rule 9(b) in order to survive dismissal. Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." F.R.C.P. 9(b). The purpose of the heightened pleading requirement of Rule 9(b) "is to provide notice, not to test the factual allegations of the claim." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 n. 2 (3d Cir.2003), citing, *Gutman v. Howard Savings Bank*, 748 F.Supp. 254, 257 (D.N.J.1990). A plaintiff satisfies Rule 9(b) when they "plead with particularity the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Lum v. Bank of America*, 361 F.3d 217, 223–24 (3d Cir.2004), citing, *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984). At a minimum, plaintiffs must "support their allegations of ... fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story ... the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Center Properties, Inc. Securities Litigation*, 311 F.3d 198, 217 (3d Cir.2002) (citations omitted). Alternatively, a plaintiff may satisfy Rule 9(b) by using some other "means of injecting precision and some measure of substantiation into their allegations of fraud." *Lum*, 361

F.3d at 224 (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984)).

Here, the Eleventh Count reads, in pertinent part:

2. Congress led Fox to believe that the Debtors were financially sound.

3. Contrary to these representations, Congress knew that the Debtors were not financially sound and failed to advise Mr. Fox.

4. Such misrepresentations were material and were made with the knowledge of their falsity and with an intent to deceive.

5. Such misrepresentations were made with an intent that Mr. Fox rely thereon and Mr. Fox reasonably relied on these representations.

6. These representations were false.

7. As a result of such false representations, [Fox has] been damaged.

*Complaint* at Eleventh Count.

This count clearly fails to satisfy the pleading standards set forth by Rule 9(b). Although the Complaint sets out the relevant parties, Congress and Fox, and the basic allegation on which the fraud claim rests, false representations concerning the Debtors financial condition, the Eleventh Count fails in other aspects. Most importantly, the Complaint fails to indicate when the alleged misrepresentations took place and how the misrepresentations were made. Without these basic factual allegations, Congress lacks a basis to adequately defend the claim. Although this inadequately plead count is subject to dismissal, at this juncture in the case, the Court believes that it is in the interest of justice to allow the Plaintiffs an opportunity to amend the Complaint to comport with the requirements of Rule 9(b).

■ The Thirteenth Count of the Complaint alleges a violation of both the New Jersey and Federal Racketeer Influenced Corrupt Organization (RICO) statutes. In order to properly plead a violation of the Federal RICO statute, 18 U.S.C. § 1961 *et seq.*, "plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Lum*, 361 F.3d at 223. Pursuant to 18 U.S.C. § 1961(5), a pattern of racketeering activity may exist only where two or more predicate "acts of racketeering" have taken place. 18 U.S.C. § 1961(5); *Id.* Under 18 U.S.C. § 1961(1), both mail and wire fraud constitute acts of racketeering. 18 U.S.C. § 1961; *Lum*, 361 F.3d at 223. However, whenever a plaintiff chooses to rely on either mail or wire fraud as the source of the required predicate acts, they must meet the heightened fraud pleading standard of Federal Rule of Civil Procedure 9(b). *Lum*, 361 F.3d at 223–24.

New Jersey's RICO Statute, N.J.S.A. 2C:41–1 *et seq.*, is quite similar to the Federal Statute. *Compare* 18 U.S.C. § 1961 *et seq.*, *with* N.J.S.A. 2C:41–1 *et seq.* Under the New Jersey Statute, it is unlawful for "any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." N.J.S.A. 2C:41–2(c). In essence, the elements that must be plead to state a claim under the New Jersey statute are the same as those necessary to state a claim under the Federal Statute: the conduct of an enterprise through a pattern of racketeering activity. Just as in the Federal Statute, New Jersey defines a pattern of racketeering activity to require at least two acts of racketeering. *N.J.S.A.* 2C:41–1(2)(d). A wide variety of acts are defined as racketeering activity, including theft and related crimes, N.J.S.A. 2C:41–1(1)(n), as well as forgery and fraudulent practices N.J.S.A. 2C:41–1(1)(*o*).

■ After reviewing the Thirteenth Count of the Complaint, this Court is satisfied that the Complaint fails to adequately state a claim under the New Jersey RICO Statute and the Federal RICO statute. Congress argues that the Plaintiffs have failed to even meet the basic pleading requirements of Federal Rule of Civil Procedure 8(a). Under Rule 8(a), a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." This is an exceptionally permissive pleading standard. The crux of the allegation under the New Jersey RICO statute is that "Defendants unlawfully misappropriated and converted to the benefit of the Enterprise assets of Lance and Target. . . . The foregoing conversion of Lance's and Target's assets by defendants constitutes acts of theft and related crimes and fraudulent practices as defined by N.J.S.A. 2C:41–1." *See* Complaint, Thirteenth Count at ¶¶ 4–5. The Thirteenth Count is devoid of other factual assertions. Therefore, the New Jersey RICO claim is subject to dismissal.

As well, the Federal RICO claim as presently stated cannot survive dismissal. In support of the Federal RICO claim, the Thirteenth Count of the Complaint states:

7. In furtherance of their scheme to appropriate Target's and Lance's assets, defendants knowingly prepared false documentation and correspondence to be sent in the mail and made further false reports and statements over the telephone.

8. The foregoing use of the mails was in violation of 18 U.S.C. Section 1341 which prohibits any person from knowingly causing the use of the mails for the

purpose of executing any scheme or artifice to defraud.

9. The foregoing use of the telephone was a violation of 18 U.S.C. Section 1343 which prohibits any person from knowingly causing the use of the United States wires for the purpose of executing any scheme or artifice to defraud.

10. Defendants engaged in numerous and repeated acts of racketeering activity as set forth in 18 U.S.C. Sections 1961–1968 (RICO) and N.J.S.A. 2C:41–1 to 2C:41–6.2 (Racketeering), and are within ten years of each other.

*Complaint* Thirteenth Count at ¶¶ 7–10. These allegations fall far short of the requirements imposed by Rule 9(b). Although the "enterprise" identified in the complaint is composed of defendants "Congress, Goz, ABC Companies, John Does and Jane Does," there is no indication of who made the allegedly false statements. Moreover, the Complaint fails to identify when the statements were made. Perhaps most importantly, the Complaint is silent as to any indication of the contents of the communications that the Plaintiffs seek to assert as the necessary predicate acts. In sum, the Thirteenth Count is utterly devoid of the basic "who, what, when, where and how" required by Rule 9(b). Despite the Plaintiffs protestations, this Court does not recognize anything in the Complaint that would inject "precision and some measure of substantiation into their allegations of fraud." *See Lum,* 361 F.3d at 224 (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984)). Therefore, the Federal RICO claim is subject to dismissal. However, similar to the Eleventh Count, the Court believes that it is in the interest of justice to allow the Plaintiffs an opportunity to amend their RICO claim to comport with the requirements of Rule 9(b). Should the Plaintiff amend the State and

Federal RICO claims, the Court directs that a RICO Case Statement be filed pursuant to Federal Rule of Civil Procedure 12(e) and U.S. Dist Ct. New Jersey Local Civil Rule 16.1(b)(4).

As a result of the foregoing analysis, the Plaintiffs' complaint has been significantly narrowed in scope. The Seventh, Eighth, Ninth, Tenth and Eleventh Counts state a claim upon which relief may granted, but may only proceed to the extent that Fox sues Congress in his personal capacity. Both the Eleventh Count and the Thirteenth Count must be amended in order to comply with the heightened pleading standards of Rule 9(b).

### 4. The Statute of Limitations

 Although not initially asserted in its motion papers, Congress has argued that Fox's claims are barred by the statute of limitations. This is an affirmative defense. As a general matter, affirmative defenses rely on matters outside of the pleadings. *Worldcom, Inc. v. Graphnet, Inc.,* 343 F.3d 651, 657 (3d Cir.2003). Therefore, except in unusual circumstance, the statute of limitations should not be raised as a defense in pre-answer motions. Instead, such defenses should by brought later in the litigation, in the form of responsive pleadings. *Id.* The only time that the statute of limitations may serve as grounds for dismissal in a Rule 12(b)(6) motion is when it is clear from the face of the complaint that the statute of limitations has in fact run. *See id. See also Romero v. Allstate Corp.,* 404 F.3d 212 (3d Cir.2005). If any set of facts can be proven that would allow the claim to proceed, dismissal is premature. *See Id.*

 Here, the Complaint includes Counts against Congress for breach of contract, conspiracy, fraud, piercing the corporate veil, RICO and other related actions. Civil actions under RICO are

generally governed by a four year statute of limitations. *See Matter of the Liquidation of Integrity Ins. Co.,* 245 N.J.Super. 133, 136, 584 A.2d 286 (App.Div.1990). In New Jersey, causes of action for breach of contract, fraud and others are governed by a six year statute of limitations. *See* N.J.S.A. 2A:14–1. Congress asserts that these claims would have to arise out of the relationship between Congress, Fox and the Debtor. According to Congress, since Fox did not lend the Debtor any money after December 5, 1995, and conducted an independent investigation of the Debtors finances in 1996, Fox knew or should have known of the claims he now asserts. Accordingly, Congress argues that as the instant action against Congress was filed on April 26, 2002, all claims prior to April 27, 1996 are barred. In contrast, Fox claims that he only learned of Congress' past wrongdoing after he purchased Target's assets pursuant to this Court's June 15, 2001 Order. *See Gahnney v. State Farm Ins. Co.,* 56 F.Supp.2d 491, 495 (D.N.J.1999) (The New Jersey Discovery rule provides that, in an appropriate case, a cause of action will not accrue until the injured party "discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a claim."). Ultimately, either party may be proven correct as discovery proceeds. However, the determination of these matters of fact are beyond the scope of this motion. Therefore, Congress' statute of limitations defense is premature.

### D. The Defendant's Motion in Limine to Suppress the Milman Tapes

After having heard the parties' arguments concerning the Milman Tapes, the Court has determined that a decision on whether or not to suppress the tapes would be premature. Should this matter proceed to trial or summary judgment, Congress may renew its motion.

### CONCLUSION

For the foregoing reasons, Congress' Motion to Dismiss is GRANTED in part and DENIED in part. The Court defers ruling on Congress' Motion in Limine at this time. The motion may be renewed at trial. Furthermore, given the significant impact that this decision will have upon the viability of the Complaint as it presently exists, the Court directs the Plaintiffs to file an amended complaint in conformity with this Opinion. Should the Plaintiff amend the RICO claims, the Court directs that a RICO Case Statement be filed pursuant to Federal Rule of Civil Procedure 12(e) and U.S. Dist. Ct. New Jersey Local Civil Rule 16.1(b)(4). Such amended complaint and RICO Case Statement must be filed within 30 days of the date of this Opinion or Counts Seven, Eight, Nine, Ten, Eleven and Thirteen shall be dismissed.

An order shall be submitted in accordance with this Opinion.

### ORDER

**THIS MATTER** having come before the Court on the Motion of the Official Committee of Asbestos Claimants for the entry of an order directing that the $150 million of payments falling due on July 15, 2005 to holders of notes issued by Building Materials Corporation of America on July 17, 1998 be made in escrow pending further order of the Court; a hearing having been conducted on July 7, 2005, and

The Court having considered the submissions of the parties; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

It is on this 12th day of July, 2005, **ORDERED** that the Motion filed by the

Official Committee of Asbestos Claimants be and hereby is **DENIED**.